# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| IN RE THE WENDY'S COMPANY | : | Case No. 1:16-cv-1153 |
| SHAREHOLDER DERIVATIVE | : | |
| ACTION | : | Judge Timothy S. Black |

## ORDER GRANTING FINAL APPROVAL OF SETTLEMENT

This civil case is before the Court on Plaintiff James Graham's motion for final

approval of the derivative litigation settlement and award of attorneys' fees and

reimbursement of expenses (Doc. 97), Thomas Caracci's objections to final approval of

the settlement (Doc. 98), and Graham's responses to those objections (Doc. 100).

## I. BACKGROUND

The parties now seek final approval of the Stipulation and Agreement of

Settlement reached between Shareholder Plaintiff Graham and Interested-Shareholder

Michael Coahn (collectively, the "Shareholders"), and Nominal Defendant The Wendy's

Company ("Wendy's" or the "Company") and the Individual Defendants (collectively,

"Defendants").[1]  (Doc. 51-1, hereinafter, the "Stipulation").

---

[1] The "Individual Defendants" include Nelson Peltz, Peter W. May, Emil J. Brolick, Clive Chajet, Edward P. Garden, Janet Hill, Joseph A. Levato, J. Randolph Lewis, Peter H. Rothschild, David E. Schwab II, Roland C. Smith, Raymond S. Troubh, Jack G. Wasserman, Michelle J. Mathews-Spradlin, Dennis M. Kass, Matthew Peltz, Todd A. Penegor, and Robert D. Wright.  As alleged, the Individual Defendants are current or former members of the Company's Board of Directors and/or current and former executive officers.  (Doc. 50 at ¶¶ 17–35).

### A.    Factual Background

Wendy's is one of the largest quick-service restaurants operating nationally and internationally.  This action arises out of third-party criminal cyberattacks at certain Wendy's franchisee-owned restaurants.

In January 2016, Wendy's announced that it was investigating reports of suspicious activity involving payment cards used at some of its restaurants.  (Stipulation at 2).  Wendy's then disclosed that cybersecurity experts found malware on certain restaurants' systems.  (*Id*.)  In May 2016, Wendy's disclosed that: "Based on the preliminary findings of the investigation and other information, the Company believes that malware, installed through the use of compromised third-party vendor credentials, affected one particular point of sale ['POS'] system at fewer than 300 of approximately 5,500 franchised North America Wendy's restaurants starting in the fall of 2015."  (*Id*.)  The malware was disabled and eradicated.  (*Id*.)

Subsequently, Wendy's announced that, in its continued investigation, the Company discovered a variant of the malware.  (*Id*.)  Wendy's believes that the malware, and the series of cyberattacks, resulted from third-party, POS service providers at franchised-owned restaurants.  (*Id*. at 2–3).  No company-owned restaurants were impacted by the cyberattack.  (*Id*. at 3).

### B.    Litigation History

On December 16, 2016, Plaintiff James Graham initiated this shareholder derivative action, alleging that the Individual Defendants breached their fiduciary duties, wasted corporate assets, were unjustly enriched, and committed gross mismanagement in

connection with the Company's cyber risks. (Doc. 1). In response, on March 10, 2017, the Individual Defendants filed a motion to dismiss Graham's complaint, arguing that Graham failed to plead demand futility under Delaware law, and/or Graham failed to state a claim. (Doc. 8).

On March 22, 2017, Coahn sent a pre-suit demand to the Company's Board pursuant to Delaware law. (Doc. 97-2 at ¶¶ 20–21). On May 24, 2017, the Company's Board, through counsel, declined to respond to the demand, citing the pending actions. (*Id.* at ¶ 21).

On March 23, 2017, Plaintiff Thomas Caracci filed another shareholder derivative action arising from the data breach. *Caracci v. Brolick, et al.*, 1:17-cv-192 (S.D. Ohio). Caracci's complaint asserted claims under federal securities law. *See id.* Graham and Caracci agreed the actions should be consolidated, but disagreed on leadership structure, including sharing the responsibilities as lead counsel. (Docs. 17, 18). The Court consolidated the actions on June 12, 2017.

Before the Court took any action related lead counsel, Graham, Coahn, Caracci, and Defendants agreed to a two-part mediation in New York City. (Doc. 51-1 at § I.C.) The two-parts were to include: (1) an information session, a confidential and privileged session allowing for the exchange of documents and information between the parties; and (2) a negotiation session. (*Id.*)

The information session occurred on July 31, 2017 before JAMS mediator Jed. D. Melnick. (Doc. 97-2 at ¶ 39). Counsel for Graham, Coahn, Caracci, and Defendants attended, as well as Graham's expert, Robert Anderson, and an expert for Caracci

pariciped. (Doc. 51-1 at § I.C.) Wendy's provided certain confidential, non-public information related to allegations in the derivative actions and the Defendants' defenses. (Doc. 97-2 at ¶ 39). After that session, negotiations briefly stalled, and the second session was not scheduled.

In early August 2017, counsel for Coahn reached out to Graham and Caracci's respective counsel, seeking to move forward with all shareholder counsel acting as equals to explore potential settlement for the benefit of the company. (Doc. 40-2 at ¶ 6–7). Graham's counsel agreed; Caracci's counsel declined. (*Id*. at ¶ 7).

On December 6, 2017, Graham and Coahn's counsel submitted a detailed settlement demand to Defendants. (Doc. 51-1 at § I.C.) Defendants were receptive. On February 12, 2018, counsel for Graham, Coahn, and Defendants attended a full day mediation with JAMS mediator Ralph B. Levy. (*Id*.) Caracci was invited to the mediation but refused to attend. (Doc. 97-2 at ¶ 42). The parties did not reach a final settlement; however, this led to continued conversations with Mr. Levy's oversight and a material settlement agreement. (*See also* Doc. 37).

On March 30, 2018, after multiple status conferences with the parties, the Court temporarily terminated Graham and Caracci's motion for lead counsel, given the impending settlement negotiations between Graham, Coahn, and Defendants. (*Id*.). On April 24, 2018, the parties requested that their motions to appoint lead counsel be reactivated. (04/24/2018 Notation Order). The Court granted leave for the parties to supplement their motions to include what impact Graham, Coahn, and Defendants' settlement agreement had on the motions. (*Id*.)

On December 17, 2018, after the Court inquired whether all Plaintiffs' counsel could reach a resolution to work together and was told they could not, Graham's counsel was appointed lead counsel. (Doc. 49). Per Court Order, Graham then filed a consolidated complaint. (Doc. 50). On February 14, 2019, Graham filed an amended motion for preliminary approval of the Stipulation. (Doc. 51).

Caracci opposed preliminary approval. (Doc. 52). Caracci also informed the Court that he wished to seek discovery from Graham, Coahn, and Defendants. (6/28/2019 Notation Order). Over Caracci's objections, the Court granted preliminary approval of the Stipulation and approved the proposed notice to shareholders. (Doc. 72). However, the Court granted Caracci leave to file a motion for leave to conduct discovery and held off notice until the discovery motion was resolved. (*Id.*)

Caracci filed a motion for leave to conduct discovery. (Doc. 73). The Court considered that motion, granting in part and denying in part Caracci's requests. (Doc. 84). The Court then entered an Order, scheduling the final settlement fairness hearing and directing notice to be given to shareholders. (Doc. 86).

Notice went out. (*See* Doc. 96). Before any motions in support or objecting to final approval were filed, Caracci filed a motion for leave to file his objections under seal and "for relief from the mediation privilege." (Doc. 89). Caracci sought Court approval to break the mediation privilege and to break non-disclosure and confidentiality agreements he signed when attending one information session. (*Id.*) The Court denied Caracci's request. (Doc. 93).

Graham filed a motion for final approval of the Stipulation and for attorney fees and expenses. (Doc. 97). The Individual Defendants and Wendy's did not oppose approval of the settlement. One shareholder filed objections: Caracci. (Doc. 98). Graham responded to those objections. (Doc. 99). On September 2, 2021, the Court held a fairness hearing for final approval of the Stipulation, and final approval is now ready for this Court's consideration.

### C.   The Settlement Terms

The Stipulation details the terms of the settlement agreement between the Shareholders (Graham and Coahn) and Defendants. (Doc. 51-1 at § IV, the "Settlement Terms"). The Shareholders agreed to release all <u>derivative</u> claims arising from the data breach. (Settlement Terms at 1.26, 4.1–4.3). In exchange, the Company agreed to institute certain "Measures" related to its cybersecurity and information technology. (*Id.* at 2). Specifically, the Company agreed to the following Measures:

> a. The Board will maintain a Technology Committee with oversight responsibilities relating to matters of information technology and cybersecurity;
>
> b. The Technology Committee will be governed by a Charter, which will include in relevant part that the Technology Committee shall oversee, among other things, cybersecurity matters;
>
> c. The Technology Committee Charter will be approved no later than fifteen (15) days prior to a hearing on any motion for final approval of the settlement;
>
> d. Management will report to the Technology Committee on any material findings arising out of the annual Qualified Security Assessor ("QSA") reviews of the Company as a merchant of record for all Company-

owned stores and as a service provider to franchisees, to the extent such QSA reviews are required by Payment Card Industry Data Security Standards ("PCI DSS");

e. The Technology Committee will retain the right to meet with the officer with oversight of the Company's cybersecurity program in executive session as the Committee deems necessary and appropriate;

f. On at least an annual basis, and more frequently if requested by the Technology Committee, the Company's Management will report to the Technology Committee regarding the Company's cybersecurity program and material cybersecurity risks;

g. The Board or a Committee thereof will continue to be authorized to retain its own IT, data and security experts and consultants to assist in its cybersecurity oversight function, as it deems necessary;

h. The Company will either (a) continue to maintain Wendy's Technology, LLC ("WeTech") or a similar entity, which will offer to Wendy's franchisees certain Foundational Security Services, as may be amended from time to time in the WeTech Products and Services Agreement or any similar document or (b) require franchisees to use a Company-approved third-party vendor(s) for similar services;

i. The Company will continue to maintain the Wendy's Technology Advisory Council ("WTAC");

j. The officer with oversight of the Company's cybersecurity program or someone who reports directly to him or her, will continue to serve as the Wendy's Member, which will be the Chair of the WTAC;

k. The Company will continue to maintain and update as needed the information security standards in its Franchisee Operations Manual or a similar document that is distributed to franchisees, and the manual or

other similar document will continue to include information regarding the franchisees' obligations to comply with PCI DSS;

l. The Company will continue to maintain and periodically re-evaluate an Incident Response Plan or a similar document to address potential significant cybersecurity incidents;

m. The Company will continue to maintain an Information Security Incident Management Plan or similar document;

n. The Company will continue to maintain and periodically re-evaluate its Information Security Policy;

o. The Company's Enterprise Risk Management team, which includes members of the Company's legal, risk management, and information security departments, will continue to meet on a regular basis, and will continue to discuss and evaluate potential risks to the Company, which may include cyber risks;

p. Management will continue to maintain monitoring for indicators of compromise on the Company's computer network endpoints, to the extent required by PCI DSS;

q. Management will continue to ensure that the Company's network topology is reasonably segmented;

r. Management will continue to deploy anti-virus protections on all Company-owned store based IT assets, to the extent required by PCI DSS;

s. Management will continue to conduct regular external and internal penetration testing;

t. The Company will continue to conduct IT table-top exercises periodically.

(*Id*. at 2.1(a)–(t)). The Company agreed to maintain these Measures for three years after an order from the Court approving final settlement. (*Id*. at 2.2).

As part of the Settlement Terms, the Company agreed to pay up to $950,000 in attorney fees and expenses (the "Fee Award") through its D&O insurance carrier(s), subject to Court approval. (*Id*. at 5.1). Up to $200,000 of the Fee Award could be awarded to a third-party, including a current Wendy's shareholder and/or their counsel, subject to Court order. (*Id*. at 5.4). Finally, as part of the Settlement Terms, the Shareholders (Graham and Coahn) may be awarded a $2,500 incentive award, to be paid from the Fee Award and subject to Court approval. (*Id*. at 5.6).

## II. FINAL APPROVAL OF SETTLEMENT

"A derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval. Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c). There is a three-step process to approving derivative action settlements: (1) "the court must preliminarily approve the proposed settlement;" (2) "members of the class must be given notice of the proposed settlement;" and (3) "after holding a [fairness] hearing, the court must give its final approval of the settlement." *Robinson v. Ford Motor Co.*, No. 1:04-CV-844, 2005 WL 5253339, at *3 (S.D. Ohio June 15, 2005) (citing *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983)). The Court is now on the final step of this process.

### D.     Notice

Under Federal Rule of Civil Procedure 23.1, notice of a proposed settlement must be given to shareholders in the manner the court orders. Fed. R. Civ. P. 23.1(c).  Notice meets the requirements of Rule 23.1 and due process if it is "reasonably calculated ... to apprise interested parties of the pendency of the action and afford them the opportunity to present their objections."  *In re Gen. Tire and Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 399 U.S. 306, 314 (1956)).  This is accomplished in a derivative action if the notice "describes the terms of the settlement, the reasons for the independent directors' determination to seek dismissal of the suits, the legal effect of the settlement and the rights of the shareholders to voice their objections."  *Id*.

Here, the Court approved the Notice when preliminarily approving the settlement agreement.  (Doc. 72).  The Notice describes the terms of the Settlement, including the request for attorney fees, the date of the final hearing, and how to object.  Moreover, per the preliminary approval, the Notice was published on Wendy's website and the Summary Notice with a link to the website was published in Wendy's Form 8-K filed with the Securities and Exchange Commission.  Wendy's counsel declares that these notice steps were met. (Doc. 96).

The Notice was reasonable under Rule 23.1 and met due process requirements.

### E.     Settlement Approval

The "principal factor" to be considered in a proposed settlement of a derivative action "is the extent of the benefit to be derived from the proposed settlement by the

10

corporation, the real party in interest." *City of Plantation Police Officers' Employees' Ret. Sys. v. Jeffries*, No. 2:14-CV-1380, 2014 WL 7404000, at *5 (S.D. Ohio Dec. 30, 2014) (citing *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir.1978); *In re Intel Corp. Derivative Litig.*, No. 09–cv–867, 2010 WL 2955178, at *1 (D. Del. July 22, 2010)).[2]

Courts routinely look to law governing class actions when considering whether a derivative action settlement should receive final approval. *See* 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1839 (3d ed. 2014). Thus, final approval of the proposed settlement is warranted if the Court finds the terms of the settlement are "fair, reasonable, and adequate." *Granada Inv., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205–06 (6th Cir. 1992). When deciding whether a settlement should receive final approval, the Court considers several factors:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 244 (6th Cir. 2011) (quoting *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)). The Court "enjoys wide discretion in assessing the weight and applicability of these factors." *Granada*, 962 F.2d at 1205-06. Finally, in considering these factors, the task of the court "is not to decide whether one side is right or even whether one side has the better of these

---

[2] Order and Final Judgment Approving Derivative Action Settlement, Adopting Report and Recommendation, and Granting Motion for Settlement, No. 2:14-CV-1380, ECF 31 (Jan. 8, 2015).

arguments . . . . The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement." *UAW*, 497 F.3d at 632.

### 1. Benefit to the Company

The Court first discusses whether the Settlement Agreement provides a substantial benefit to the Company, given: (1) this is a significant consideration when approving a derivative action settlement; and (2) the entire substance of the Settlement Agreement is corporate governance reforms, *i.e.*, there are not monetary damages.

"Case law makes clear that corporate governance reforms, unaccompanied by monetary damages, may form the basis for an attorney's fee award where the reforms confer a "substantial benefit" on the plaintiff corporation." *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 488 (D.N.J. 2012) (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970) ("a corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature"); *In re NVIDIA Corp. Derivative Litig.*, No. C–06–06110–SBA (JCS), 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008) (approving an award for attorney's fees in connection with a settlement comprised largely of corporate governance reforms because "strong corporate governance is fundamental to the economic well-being and success of a corporation"); *Unite Nat. Ret. Fund v. Watts*, No. CIV.A. 04CV3603DMC, 2005 WL 2877899, at *5 (D.N.J. Oct. 28, 2005) (concluding the corporate governance reforms conferred a "great benefit" on the plaintiff corporation because the reforms will "serve to prevent and protect [the corporation] from the reoccurrence of certain alleged wrongdoings.")). *See also, Granada*, 962 F.2d at 1209;

*Gilbert v. Abercrombie & Fitch, Co.*, No. 2:15-CV-2854, 2016 WL 4159682, at *19
(S.D. Ohio Aug. 5, 2016), *report and recommendation adopted*, No. 2:15-CV-2854, 2016
WL 4449709 (S.D. Ohio Aug. 24, 2016); *City of Plantation*, 2014 WL 7404000 at *6.

Here, the Settlement Terms for specific reforms targeted Wendy's overall
cybersecurity and information technology. (Settlement Terms at 2.1). The reforms
directly confront the issues of this litigation, and include reforms such as: (1) the
Company creating and maintain a Technology Committee, with oversight and
responsibility over the Company's information technology and cybersecurity; (2) the
Company reporting material findings from third party QSA reviews to the Technology
Committee at least annually; (3) the Company maintaining a Technology Advisory
Counsel to engage with the Company's franchise-owned restaurants regarding
cybersecurity and technology matters; and (4) the Company either providing foundational
security services to franchise-owned restaurants or a list of approved, third-party vendors
for similar services. *Id.* These reforms provide a substantial benefit to the Company and
its shareholders through: (i) overall cybersecurity enhancements to the Company; and
(ii) targeted reforms for the cybersecurity of its franchise-owned restaurants, the alleged
targets of this cyberattack.

Moreover, this action and the Settlement Terms have already resulted in the
Company taking significant steps to improve its overall cybersecurity, as shown by the
existence of the Technology Committee. The Technology Committee was formed in
November 2017, after settlement discussions had started and the exchange of knowledge

at the information session.[3]  The governance of the committee was officially codified when the Technology Committee Charter became effective on June 4, 2018, after the material settlement was reached.  Pursuant to the Settlement Terms, although Wendy's has been performing for over three years already, it must continue to perform for three years after any final order.  Thus, these governance reforms have already provided, and will continue to provide, a substantial benefit to the Company and its shareholders.

In derivative actions such as this, where corporate governance reforms are the sole benefit to a company, it is difficult, if not impossible, to put an exact value on the benefit the Company and its shareholders receive from the Settlement Terms.  Nor does this Court attempt to put a monetary value to the Settlement Terms.  However, the Court recognizes that the Company also settled two class action lawsuits related to the data breach and brought by financial institutions and consumers for $50 million and $3.4 million, respectively.  *See First Choice Federal Credit Union, et al. v. The Wendy's Company, et al.*, No. 2:15-cv-506 (W.D. Pa. filed April 25, 2016); *Torres, et al. v. Wendy's International, LLC*, No. 6:16-cv-210 (M.D. Fl. filed Feb. 8, 2016).  The Court is not aware, nor has been made aware, of any substantial data breach since this incident or after the Measures were implemented, further demonstrating substantial benefit to the company.  Thus, there is clearly some significant monetary value to enhancing cybersecurity and working to prevent future attacks or data breaches.

---

[3] Doc. 100 at 4.  *See* Wendy's Proxy Statement on Form DEF 14A filed with the SEC on April 20, 2018, page 28, available at
https://www.sec.gov/Archives/edgar/data/30697/000119312518125056/d514187ddef14a.htm.

Accordingly, based on the foregoing, the Company will and is receiving a substantial benefit from the Settlement Terms, which supports a final approval.

### 2. Risk of Fraud or Collusion

In general, "[c]ourts presume the absence of fraud or collusion unless there is evidence to the contrary." *Gilbert*, 2016 WL 4159682 at *8 (quoting *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006)). However, some courts have raised concerns of collusion in derivative actions when there is a broad release of claims, case award to counsel, and non-cash recovery for absent shareholders. *See, e.g.*, *City of Plantation*, 2014 WL at * 6 (citing *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 778 (3d Cir. 1995); *In re Zoran Corp. Derivative Litig.*, No. 06–cv–5503, 2008 WL 941897, at *2 (N.D. Cal. Apr. 7, 2008)).

Here, the Court finds no risk of fraud or collusion. To be sure, the settlement agreement does not provide for a cash recovery to either the Company or its shareholders. However, as discussed, the Company will receive, and has already received, a substantial benefit from the Settlement Agreement in the form of the Technology Committee. The Settlement Agreement only releases derivative, not direct claims.

Moreover, this is not a case where the action was brought and the Court was immediately presented with a Settlement Agreement. *See, e.g.*, *City of Plantation*, 2014 WL 7404000 at *7. Graham's counsel investigated the data breaches for over five months before filing suit, and it took Shareholder Counsel and the Individual Defendants 14 months into the litigation to reach a material settlement agreement on substance. The parties' agreement on substantive terms was reached before any negotiation on attorney

15

fees, indicating an absence of fraud or collusion.  (Doc. 60-1 at ¶¶ 30–31; Doc. 60-2 at ¶¶ 10–12; Doc. 61-1 at ¶¶ 38–39).  *See also Gascho v. Glob. Fitness Holdings, LLC*, No. 2:11-CV-436, 2014 WL 1350509, at *25 (S.D. Ohio Apr. 4, 2014) ("The risk of collusion is also lessened in this action because the parties negotiated the payment of attorney[] fees and costs after having reached agreement on the relief to the Class and Subclasses."), *report and recommendation adopted*, No. 2:11-CV-436, 2014 WL 3543819 (S.D. Ohio July 16, 2014), *aff'd*, 822 F.3d 269 (6th Cir. 2016).

Finally, as this Court already recognized when preliminarily approving the settlement, the Court has already been presented with the declaration of Mediator Levy, who averred under penalty of perjury that the mediation occurred at arms-length and he witnessed nothing that would suggest collusion or inappropriate conduct.  (Doc. 60-2; *see also* Doc. 72 at 9, 21).

Accordingly, this factor weighs in favor of approving final settlement.

### 3. Complexity, Expense, and Duration of the Litigation

"Generally speaking, '[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them.'"  *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001), *decision clarified*, 148 F. Supp.2d 936 (S.D. Ohio 2001) (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp.2d 164, 174 (S.D.N.Y. 2000)).  Moreover, "[s]hareholder derivative suits are notoriously difficult and unpredictable."  *In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*, No. 2:09-2009 SMH V, 2013 WL 12329512, at *4 (W.D. Tenn. Sept. 5, 2013) (quotation omitted).

This action involves an alleged data breach across Wendy's franchises. Graham asserted a breach of fiduciary duty claim, which at the onset prompted a motion to dismiss. Assuming Graham survived the motion to dismiss, the parties likely would have engaged in substantial paper discovery and depositions, and Defendants would likely have filed a dispositive motion.

This factor weighs in favor of approving the settlement.

### 4.     Amount of Discovery

"Formal discovery is not required." *In re Regions Morgan Keegan*, 2013 WL 12329512 at *4 (citing *Sheick v. Auto Component Carrier LLC*, No. 09-CV-14429, 2010 WL 4136958, at *19 n.3 (E.D. Mich. Oct. 18, 2010)). However, "[t]he parties must develop a body of information sufficient: (i) to permit informed assessment of the litigation and settlement; (ii) to inform the Court that the dispute is genuine and based on good-faith, albeit diametrically opposed, legal positions; and (iii) to support the conclusion that the settlement is reasonable and desirable from all perspectives." *Id.*; *see also City of Plantation*, 2014 WL 7404000 at *7.

Here, the parties engaged in targeted but thorough discovery, which discovery included: (1) Graham's counsel engaging in a five-month pre-suit investigation; (2) the Section 220 documents; (2) additional, confidential documents exchanged during the information session; and (3) the information session of the mediation, which purpose was the exchange of information between the parties. Moreover, discovery in this case included the assistance of Robert Anderson, Plaintiff's cybersecurity expert. Anderson is a cybersecurity expert and former national security executive with the Federal Bureau of

Investigation ("FBI").  (Doc. 97-2 at ¶ 37; *see also* preliminary order).  As part of the settlement process, he assisted Plaintiff with understanding the documents and recommending solutions to benefit the Company's cybersecurity.

Accordingly, this factor weighs in favor of approving settlement.

## 5.    Likelihood of Success on the Merits

"The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits.  The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *Poplar Creek Dev. Co.*, 636 F.3d at 245 (quoting *In re Gen. Tire & Rubber*, 726 F.2d at 1086).  Settlements are particularly favored in shareholder derivative actions "because litigation is notoriously difficult and unpredictable."  *In re Regions Morgan Keegan*, 2013 WL 12329512, at *3.

Graham asserted a breach of fiduciary duty claim.  The Company is a Delaware corporation; thus, Delaware law governs the fiduciary duties of its directors.  Gilbert, 2016 WL 4159682 at *9.  Graham likely faced significant hurdles when succeeding on a breach of fiduciary duty under Delaware law.

For example, Graham's complaint was already facing a motion to dismiss based on his failure to make a demand on the Board or to adequately plead demand futility before bringing his suit.  (Doc. 8).  *See, e.g.*, *Heine v. Streamline Foods Inc.*, 805 F. Supp. 2d 383, 394 (N.D. Ohio 2011) (discussing demand futility for derivative claims

under Delaware law).[4] Moreover, had Graham survived past the pleading stage, proving a breach of fiduciary duty claim under Delaware law is difficult because of the business judgment rule. *Gilbert*, 2016 WL 4159682 at *9 ("corporate directors must use that amount of care which ordinarily careful and prudent men would use in similar circumstances") (applying Delaware law) (quotation omitted). Thus, "in order to establish a breach, a plaintiff pursuing such a claim must establish that a decision of the board resulted in loss because that decision was ill advised or grossly negligent or that a board's failure to act resulted in loss because due attention would have prevented the loss." *Id*. "This is no easy task." *Id*.

Considering the foregoing, there is no certainty that Graham was certain to succeed on the merits. This factor weighs in favor of settlement.

### 6. Opinions of Counsel & Representatives

Shareholder Counsel and counsel for the Individual Defendants and the Company—all with years of experiences in shareholder derivative actions—recommend that the Court approve the Settlement Agreement and this recommendation is entitled to deference. *See, e.g.*, *Williams*, 720 F.2d at 922–23 ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs[,]" and that deference "should correspond to the amount of discovery completed and the character of the evidence uncovered.").

The only counsel that disputes the settlement is Caracci's counsel. His objections are discussed *infra*. As the Court recognized in its Order appointing lead counsel,

---

[4] *See also* Order Granting Preliminary Approval. (Doc. 72 at 19).

Caracci's counsel and their firms are also experienced and well-respected.  However, Caracci's lone objections through counsel do not outweigh the support from counsel and the respective firms for Graham, Coahn, the Individual Defendants, and the Company.

This factor tips in favor of approving settlement.

### 7.    Reactions of Shareholders

In determining whether a settlement is fair, adequate and reasonable, a court must also consider the reaction of absent shareholders.  *See Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir. 2013).  Here, the Court is presented with only one shareholder objector, Thomas Caracci.  A lone objector, particularly when the number of shareholders in a publicly-traded company like Wendy's is vast, tends to support final approval of the settlement because most of the shareholders have "no qualms with it." *Olden v. Gardner*, 294 Fed. App'x 210, 217 (6th Cir. 2008) (finding that 79 objections in a class of nearly 11,000 members "tends to support a finding that the settlement is fair"). *See also In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 500 (E.D. Mich. 2008) ("If only a small number [of opt outs or objections] are received, that fact can be viewed as indicative of the adequacy of the settlement.") (internal quotations omitted; alteration in original); *Hainey v. Parrott*, 617 F.Supp. 2d 668, 675 (S.D. Ohio 2007) ("Generally, however, a small number of objections, particularly in a class of this size, indicates that the settlement is fair, reasonable and adequate.").

Accordingly, this factor weighs heavily in favor of approving the settlement.

### 8. Public Interest

Public interest also favors approval of the proposed settlement. "[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003) (quoting *Granada*, 962 F.2d at 1205); *see also In re Nationwide Fin. Servs. Litig.*, No. 2:08-cv-00249, 2009 WL 8747486, at *8 (S.D. Ohio Aug. 19, 2009) ("[T]here is certainly a public interest in settlement of disputed claims that require substantial federal judicial resources to supervise and resolve."). Moreover, the proposed settlement ends potentially long and protracted litigation and frees up judicial resources. *See In re Telectronics*, 137 F. Supp. 2d at 1025.

Accordingly, this factor weighs in favor of approving the settlement.

### F. Carcci's Objections

As mentioned, only one shareholder objected to the final settlement: Thomas Caracci. Caracci filed his own derivative action arising from the allege data breach, three months after Graham filed his action. However, before Caracci filed his action, he made a demand on the board, whereas Graham did not. Caracci and Graham's actions were consolidated and counsel for each plaintiff moved for appointment as lead counsel. After a material settlement was reached, Graham's counsel was appointed lead counsel.

Graham then moved for preliminary approval. Caracci has actively opposed the settlement from the onset, filing an opposition to the motion for preliminary approval. The Court has already considered, and rejected, that opposition to preliminary approval.

21

The Court now considers Caracci's objections to final approval, which may be distilled down to four objections.

### 1. Knowledge of Shareholder Counsel

Caracci first argues that Graham, Coahn, and their counsel lacked sufficient knowledge before entering into the settlement. Specifically, Caracci, like Graham, retained an expert in this case. Caracci takes issue with Shareholders' Counsel's failure to consider or implement the reforms suggested by Caracci's expert. (Doc. 98 at 4).

However, whether Caracci would have agreed to different settlement terms is not dispositive of the actual settlement that was reached. At this stage, the Court is not tasked with whether a different, or even better, settlement could have been reached. The Court is tasked with determining whether the settlement presented is "fair, reasonable, and adequate." *See In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 998 (N.D. Ohio 2016) ("so long as the settlement agreements and the processes used to effectuate them are 'fair, reasonable, and adequate,' Federal Civil Rule 23(e)(2), this Court has no reason to disapprove them").

Also, as reflected *supra*, Shareholders' Counsel and Defense counsel are well-experienced and were well-informed when reaching this settlement. The parties engaged in a significant information session, exchanging necessary discovery for the parties weigh the strength and weaknesses of each other's cases. The parties were assisted by a well-respected and credentialed cybersecurity expert, Robert Anderson.

This objection is not well-taken.

22

### 2.    Date of Settlement

Caracci also contends that the settlement is now outdated because cybersecurity has changed drastically over the past three years.  (Doc. 98 at 4).  However, the Technology Committee is not a static being.  The Technology Committee is and will provide oversight of Wendy's cybersecurity and information technology.  The Technology Committee also provides reporting on cybersecurity, based on (at least) annual, third-party QSAs.  This would allow the Company to recognize issues and grow and respond as necessary to protect the company.

Moreover, as Graham's counsel represented at the fairness hearing, the delay in final approval of the settlement has actually provided additional benefit to the company and its shareholders.  Pursuant to the Settlement Terms, the Company must keep the Settlement Terms in place for at least three years after final approval, and the Company had already started performing pursuant to the Settlement Terms.  Thus, the shareholders are receiving an additional benefit from the Technology Committee already being implemented.  This objection is not well-taken.

### 3.    Attorney Fee Disclosure

Although not in his written objections, Caracci's counsel stated at the settlement hearing that Plaintiff's request for attorney fees, discussed *infra*, should not be awarded because Plaintiff's counsel did not comply with the undersigned's Cincinnati Civil Procedures Standing Order. The Attorney's Fees provision in that Order reads in full:

> Any party who intends to apply to the Court for the payment of his or her attorney's fees by an opposing party shall provide to opposing counsel a statement showing the gross

amount of attorney fees, costs, and other expenses incurred every 120 days from the date the complaint is filed. Each activity to be reimbursed should be listed, together with date, the number of hours, and the nature of the activity. Failure to provide timely statements <u>may</u> be considered a release of the opposing party from the payment of such fees.

The Court shall consider a party's successive attorney fee statements after a verdict or judgment has been rendered, and shall limit its consideration to the reasonable compensation for the necessary services rendered and the reasonable and necessary expenses incurred by the trial attorney(s) in the case. Pursuant to S.D. Ohio Civ. R. 54.2, counsel shall have 45 days from the date of judgment to submit her/[his] fee application. Opposing counsel shall respond 10 days after receipt of the application.

(Black, J. Civil Procedures Standing Order) (emphasis added).[5]

The two purposes behind that provision are to: (1) put the other party on notice that a party may seek fees; and (2) allow the other party to weigh those fees, and the possibility of being ordered to pay those fees, as the litigation proceeds. This provision is particularly useful in cases where attorney fees are mandated by statute, such as certain employment litigation or in actions such as this where attorney fees are naturally considered if settlement is reached.

However, whether Graham and Coahn's counsel provided such an attorney fee disclosure does not automatically preclude this Court from awarding fees. The fee agreement reached between Graham and Defendants, subject to Court approval *infra*, was reached in an arms-length process, as evidenced by needing a mediator's proposal on fees

---

[5] *See*
https://www.ohsd.uscourts.gov/sites/ohsd/files//civil%20procedures%20in%20cincinnati%2011-13%20%282%29.pdf.

because the parties could not agree.  The Settlement Terms contemplate that the Shareholders' Counsel will seek fees, which Fee Award is discussed *infra*.[6]

Finally, it is worth mentioning that Caracci's counsel, although now an objector, was not precluded from seeking a portion of fees. The Settlement Terms contemplated paying up to $200,000 of the Fee Award to a third-party, such as shareholder objector or their counsel.  The Sixth Circuit also acknowledges that "fees and costs may be awarded to the counsel for objectors to a class action settlement if the work of the counsel produced a beneficial result for the class."  *Gascho*, 822 F.3d at 294 (quoting *Olden v. Gardner*, 294 Fed. App'x. 210, 221 (6th Cir. 2008).  Caracci has not requested any fees.

Accordingly, this objection is not well-taken and overruled.

### 4.    Mediation Privilege

Finally, Caracci takes issue with this Court's prior order denying him relief from the mediation privilege, raised in both his written objections and at the fairness hearing. Before objecting to the final settlement, Caracci requested that this Court: (1) grant him relief from the mediation privilege; and (2) permit him to breach two confidentiality agreements he and his counsel signed prior to participating in a mediation session with Graham, Coahn, and Defendants.

Caracci contended he needed to break the privilege and the contracts to present information to the Court.  Specifically, at the settlement hearing, counsel for Caracci

---

[6] The Court appreciates that Caracci's counsel complied with this Court's Standing Order, leading to the disclosure that stalled initial rounds of settlement discussions.  But not awarding any fees for counsel's failure to comply, assuming Plaintiff's counsel did not disclosure such fees, ends the fee analysis on a technicality.

stated that, because of the Court's Order, Caracci could not address his perceived problems with the mediation process.

This objection is not well-taken. As already discussed in the Court's prior Order, Caracci was both contractually bound and precluded by the mediation privilege from divulging communications and documents exchanged when he was a part of settlement discussions. The underlying complaint of Caracci's objection is his attempt to suggest that there were issues during the mediation. This argument reads eerily familiar to those arguments Caracci already presented when opposing preliminary approval: that the mediation process was flawed and the settlement a child of collusion. This Court has considered—and rejected—those arguments.

As discussed *supra*, all factors support a finding that the settlement is "fair, reasonable, and adequate." When considering the Settlement Terms and Caracci's objections, the Court finds that the proposed settlement provides a substantial benefit to the company and its shareholders. The final settlement is approved.

## III. ATTORNEY FEES & COSTS

Plaintiff's successful prosecution of this action justifies an award of reasonable attorneys' fees. *See Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1194 (6th Cir. 1974) (citing *Mills*, 396 U.S. 375). Here, Shareholders' Counsel requests a Fee Award of $950,000 in attorney fees and costs. The Fee Award is an amount agreed-to by Shareholders' Counsel and Defendants and based on a Mediator's Proposal for fees and expenses, subject to Court approval. The Fee Award accounts for $1,163,314.24 in

26

attorney fees for 1,677 hours of work and $68,596.99 in expenses accrued by Shareholders' Counsel when litigating this action.

As discussed *infra*, the Court finds the requested Fee Award reasonable in this case and will grant Shareholder Counsel's request.[7]

### A.    Lodestar Method

In general, "there are two methods for calculating attorney fees: the lodestar and the percentage-of-the-fund." *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 Fed. App'x. 496, 498 (6th Cir. 2011). "District courts have discretion 'to select the more appropriate method for calculating attorney's fees in light of the unique characteristics [of shareholder derivative suits] in general, and of the unique circumstances of the actual cases before them.'" *Id*. (quoting *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)). "The lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved." *Rawlings*, 9 F.3d at 516. A district court "generally must explain its 'reasons for adopting a particular methodology and the factors considered in arriving at the fee.'" *Id*. (quoting *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009)).

Here, Plaintiff's counsel requests a fee award based on the lodestar method. The Court agrees. This method is particularly appropriate in a derivative action when there is

---

[7] Shareholder Counsel, in their brief and at the fairness hearing, suggest that the Court need not get too caught up in the lodestar calculation because, based on the *Ramey* factors *infra*, the requested Fee Award is overall reasonable. Although the Court ultimately agrees that the Fee Award is reasonable, a district court is required is explain its reasoning for awarding fees and the methodology used to reach the result. In sum, the Court must (and the party requesting the fee award should also) show its work.

no common fund and the exact value of the resulting benefit to Wendy's and its shareholders cannot be precisely determined. Thus, in this case "[t]he lodestar method will account for the amount of work performed by counsel and will ensure that counsel is fairly compensated for the results achieved." *City of Plantation*, 2014 WL 7404000 at *11 (citing *Rawlings*, 9 F.3d at 515–16; *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005)).

In determining an appropriate "lodestar" figure, a court multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir.1995) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The court "may then, within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation." *Adcock–Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (citing *Reed v. Rhodes*, 179 F.3d 453, 471–72 (6th Cir.1999)).

## B. Reasonable Hours

> [T]he key requirement for an award of attorney fees is that the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation . . . . Although counsel need not record in great detail each minute he or she spent on an item, the general subject matter should be identified.

*Gascho*, 822 F.3d at 281 (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008)) (internal quotation marks and citations omitted).

In support of the hours worked, Shareholder Counsel provides three declarations of the 1,677 hours of time worked on this action, one from an attorney at each of the Shareholder Counsel's law firms. (Docs. 97-3, 97-10, 97-11). Shareholder Counsel declares, and also represented at the fairness hearings, that the amount of hours expended on the litigation were reasonable in their experience. Shareholder Counsel also provides examples of the litigation tasks undertaken by each firm, leading to the amount of hours worked. (Doc. 97-3 at ¶ 7; Doc. 97-10 at ¶ 7; Doc. 97-11 at ¶ 7).

The Court finds that 1,677 hours spent on the action was reasonable. Although a better practice would be to submit more detailed records of the time expended in the litigation," the Court finds that 1,677 hours billed on the action was reasonable, particularly given the procedural history, settlement discussions, and number of filings in this case. *See Imwalle*, 515 F.3d at 553 ("The key requirement for an award of attorney fees is that the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation . . . . Although counsel need not record in great detail each minute he or she spent on an item, the general subject matter should be identified.") (internal citations and quotations omitted).

## C. **Hourly Rate**

Next, the Court considers Shareholders Counsel's hourly rates. As explained by the Sixth Circuit:

> This circuit uses the "community market rule" to calculate a reasonable billing rate. Under that rule, the billing rate "should not exceed what is necessary to encourage competent lawyers within the relevant community to undertake legal representation. In a similar vein, our court has made clear that lawyers are entitled only to "reasonable" fees and that such fees are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region. The burden is on the lawyer seeking fees to submit evidence—in addition to the attorney's own affidavits—showing that the requested rate is reasonable.

*Linneman v. Vita-Mix Corp.*, 970 F.3d 621, 630 (6th Cir. 2020) (cleaned up).

Here, Shareholders Counsel seeks fees for 1,647.9 hours of work completed by 12 attorneys. The average hourly rate of all Shareholders Counsel is around $625 per hour. (*See* Docs. 97-3, 97-10, 97-11). However, the majority of the hours expended by Shareholder Counsel on this matter were billed at a rate of $725 per hour or higher. (*Id.*) From this Court's experience and when comparing this rate to the hourly rates awarded for other cases in this district, this hourly rate is significantly higher than the prevailing market rate in Cincinnati, Ohio.

Based on the documentation provided by Shareholder Counsel, the Court is able to derive the years of experience of some Shareholder Counsel, ranging from 4 to 36 years, but not all.[8] Shareholder Counsel represented at the fairness hearing that the rates sought by counsel are reasonable, particularly because many of the attorneys are East Coast attorneys. Two of the three Shareholder Counsel law firms are not based in or around

---

[8] Shareholder Counsel does not actually list the years of experience. This Court finds the years of experience for certain Shareholder Counsel based on the biographies provided by Shareholder Counsel. (Doc. 97-3, Ex. A; Doc. 97-10, Ex. A; Doc. 97-11, Ex. A).

Ohio: Faruqi & Faruqi is a New York-based law firm, and The Weiser Law Firm is a Pennsylvania-based law firm.

"A court may, [] award a higher hourly rate for an out-of-town specialist if (1) hiring the out-of-town specialist was reasonable in the first instance, and (2) if the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation." *Brian A. v. Hattaway*, 83 F. App'x 692, 694 (6th Cir. 2003) (citing *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995)). Here, hiring out-of-town specialists was not unreasonable, given Wendy's is a Delaware company operating worldwide. However, the Court is not presented with any evidence (other than the attorney's affidavits) that the rates presented by *any* counsel, local or not, are consistent with rates for similar services by lawyers of reasonably comparable skills, experience, national reputation.

Shareholder Counsel also seeks fees for 29.15 hours of work completed by 4 paralegals. The rate for the 4 paralegals ranges from $250 to $300 per hour. Shareholder Counsel provides <u>no</u> evidence of the paralegals' qualifications or evidence of that particular work the paralegals performed. Three of the paralegals work for Faruqi & Faruqi and one is at Strauss Troy.

Accordingly, based on the lack of evidence provided by Shareholder Counsel, the Court finds that the rates of both the attorneys and paralegals should be adjusted to a common market rate in Cincinnati, Ohio.

This venue has often looked to the 1983 "Rubin rates," a list of pre-calculated billing rates tiered by years of experience to determine reasonable rates for the area and

apply a 4% annual cost-of-living allowance.[9] *See, e.g.*, *Lee v. Javitch, Block & Rathbone, LLP*, 568 F. Supp. 2d 870, 876 (S.D. Ohio 2008); *Hunter*, 2013 WL 5467751 at *17.

Here, the Court finds using adjusted Rubin rates appropriate because the rates requested by Shareholder Counsel are well-above the community rates. The Court further finds using the 2019 Rubin rates appropriate in this case. The Court adjusts the 1983 rate to 2019 because: (1) the life of this litigation spanned from December 2017 until late 2021; (2) substantive filings spanned from 2018 through 2021; and (3) using 2019 provides the median rate. The rates for paralegals will also be adjusted based on the Rubin rate. Finally, the Court recognizes that it does not know the years of experience for all counsel. When the years of experience is unknown, the Court concludes that using the intermediate level of fee award for associates and partners is an appropriate and

---

[9] That committee arrived at the following categories and hourly rates for 1983:

| | |
|---|---|
| Senior Partners (21 or more years of experience) | $128.34 |
| Intermediate Partners (11 to 20 years of experience) | $113.43 |
| Junior Partners (6 to 10 years of experience) | $96.39 |
| Senior Associates (4 to 5 years of experience) | $82.81 |
| Intermediate Associates (2 to 4 years of experience) | $71.62 |
| Junior Associates (2 years of experience or less) | $61.77 |
| Law Clerks | $23.96 |
| Paralegals | $37.91 |

*See Hunter v. Hamilton Cty. Bd. of Elections*, No. 1:10CV820, 2013 WL 5467751, at *17, n.9 (S.D. Ohio Sept. 30, 2013) (citation omitted).

equitable balance of the work accomplished by counsel and the lack of evidence of years of experience.[10]

Thus, the Court adjusts the rates as follows:

| Name | Title-Firm | Years | Hours | Hourly Rate Requested | Adjusted Hourly Rate | Total After Adjustment |
|------|-----------|-------|-------|----------------------|---------------------|----------------------|
| Nadeem Faruqi | Partner – Faruqi & Faruqi | 34 | 32.5 | $850.00 | $526.70 | $17,117.75 |
| Stuart Guber | Partner – Faruqi & Faruqi | 31 | 600 | $775.00 | $526.70 | $316,020.00 |
| Nina Varindani | Partner – Faruqi & Faruqi | 11 | 289.45 | $625.00 | $465.51 | $134,741.87 |
| Alex Heller | Partner – Faruqi & Faruqi | 6 | 163 | $575.00 | $395.80 | $64,515.40 |
| Christopher Lash | Associate – Faruqi & Faruqi | 4 | 92.1 | $525.00 | $293.92 | $27,070.03 |
| Richard Wayne | Partner – Strauss Troy | 30+ | 109.75 | $785.00 | $526.70 | $57,805.33 |
| William Flynn | Partner – Strauss Troy | 36 | 60.5 | $725.00 | $526.70 | $31,865.35 |

---

[10] For example, one attorney biller is Robert Weiser, named partner and founder of the The Weiser Law Firm. The Court appreciates that Mr. Weiser likely has more than 20 years of experience, but Shareholder Counsel does not evidence as such. (Doc. 97-11). Moreover, The Weiser Law Firm also includes billing for Brett Stecker. (*Id.* at ¶ 8). Mr. Stecker appeared once before this Court on behalf of Mr. Coahn (*see* 06/28/2019 Notation Order) and submitted a declaration in support of Graham's motion for lead counsel (Doc. 40-2). However, <u>zero</u> background information is provided on Mr. Stecker. (*See generally*, Doc. 97-11.). This showcases the lack of evidence provided by Shareholders Counsel, and why this Court finds it equitable to use the intermediate level.

| Jeffrey Levine | Associate – Strauss Troy | N/A | 19.3 | $285.00 | $293.92 | $5,672.66 |
|---|---|---|---|---|---|---|
| R. Austin Stevenson | Associate – Strauss Troy | N/A | 8.5 | $265.00 | $293.92 | $2,498.32 |
| Robert Weiser | Partner – Weiser Firm | N/A | 22.75 | $1,000.00 | $465.51 | $10,590.35 |
| James Ficaro | Partner – Weiser Firm | N/A | 189.75 | $725.00 | $465.51 | $88,330.52 |
| Brett Stecker | Partner – Weiser Firm | N/A | 60.25 | $690.00 | $465.51 | $28,046.98 |
| Derek Behnke | Paralegal – Faruqi & Farugi | N/A | 8.9 | $300.00 | $155.58 | $1,384.66 |
| Brian Giacalone | Paralegal – Faruqi & Farugi | N/A | 2.25 | $275.00 | $155.58 | $350.06 |
| Anthony Alouise | Paralegal – Faruqi & Faruqi | N/A | 10.25 | $275.00 | $155.58 | $1,594.70 |
| Annie Jansen | Paralegal – Strauss Troy | N/A | 7.75 | $250.00 | $155.58 | $1,205.75 |
| | | | 1,677 hours | | | $788,809.71 |

Accordingly, the Court finds the lodestar for the reasonable number of hours and adjusted rates to be $788,809.71.

## D.  Overall Reasonableness and Multiplier

In assessing the overall reasonableness of a fee award, courts

> [o]ften, but by no means invariably, . . . address these factors:
> "(1) the value of the benefit rendered to the plaintiff class; (2)
> the value of the services on an hourly basis; (3) whether the
> services were undertaken on a contingent fee basis; (4)
> society's stake in rewarding attorneys who produce such
> benefits in order to maintain an incentive to others; (5) the
> complexity of the litigation; and (6) the professional skill and
> standing of counsel involved on both sides."

*Moulton*, 581 F.3d at 352 (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir.

1996)).  *See also Ramey*, 508 F.2d at 1196.

Moreover, when assessing reasonableness, the Court may, "within limits, adjust

the 'lodestar' to reflect relevant considerations peculiar to the subject litigation."

*Adcock–Ladd*, 227 F.3d at 349 (quoting *Reed*, 179 F.3d at 471–72).  In adjusting the

lodestar to arrive at a reasonable fee award, a court may consider the following factors:

> "(1) the time and labor required by a given case; (2) the
> novelty and difficulty of the questions presented; (3) the skill
> needed to perform the legal service properly; (4) the
> preclusion of employment by the attorney due to acceptance
> of the case; (5) the customary fee; (6) whether the fee is fixed
> or contingent; (7) time limitations imposed by the client or
> the circumstances; (8) the amount involved and the results
> obtained; (9) the experience, reputation, and ability of the
> attorneys; (10) the 'undesirability' of the case; (11) the nature
> and length of the professional relationship with the client; and
> (12) awards in similar cases."

*Id*. at 349 n.8 (quoting *Reed*, 179 F.3d at 471–72 n.3).  Of these factors, the "results

obtained" is the most important factor in determining the reasonableness of a fee award.

*Kentucky Rest. Concepts Inc. v. City of Louisville*, 117 F. App'x 415, 420 (6th Cir. 2004)

(citing *Hensley*, 461 U.S. at 434–36).  *See also Adcock–Ladd*, 227 F.3d at 349 ("A highly

important *Johnson* factor is the result achieved.") (emphasis in original).

Here, the *Ramey* factors are met. Shareholder Counsel provided a benefit to the Company and its shareholders because the settlement reached with counsel's assistance provides a significant benefit to the Company and its cybersecurity. Shareholder Counsel undertook this representation on a contingent fee basis. Society has an interest in having competent and experienced counsel take on complex litigation such as this.

Reasonableness is also shown by the multiplier in this case. Had the Court not adjusted Shareholders' Counsel's hourly rates, the Fee Award multiplier is in the negative: -0.82. With the hourly fee adjustment, the multiplier becomes positive: +1.2. This Court has previously recognized that fees in similar cases have received a lodestar multiplier between 1.25 and 2.29. *City of Plantation*, 2014 WL 7404000, at *18 (collecting cases).

Shareholder Counsel also provides a list of cases with similar fee awards in shareholder derivative actions, including actions in which the sole or main benefit to the company and its shareholders was corporate governance reforms.[11] Thus, when

---

[11] *See, e.g.*, *City of Plantation*, 2014 WL 7404000, at *2, *19 (approving $1,616,595 fee as part of a settlement that was negotiated prior to filing suit and involving only corporate governance reforms); *In re Gas Natural Inc.*, No. 1:13-cv-02805, slip op. ¶ 9 (N.D. Ohio Apr. 17, 2017), Doc. 128 (approving $3.2 million fee as part of settlement that only included corporate governance reforms); *Booth Family Trust v. Jeffries, et al.*, No. 2:05-cv-00860, slip op. (S.D. Ohio Dec. 19, 2011), Doc. 263 (approving $1.5 million fee award in a settlement that only included corporate governance reforms); *In re Johnson & Johnson,* 2013 WL 6163858 at *8 (approving $5,383,905.76 fee as part of a settlement involving only corporate governance reforms); *In re The Home Depot, Inc. S'holder Derivative Litig.*, Case No 1:15-CV-2999-TWT, slip op. at 5 (N.D. Ga. Oct. 2, 2017), Doc. 84 (approving $1.125 million fee); *Belova v. Sharp, et al.*, Docket No. 3:07-cv-0299-MO, slip op. (D. Or. Aug. 12, 2009), Doc. 79 (awarding fees totaling $2,950,000); *Molloy v. Boynton, et al.*, No. 3:17-cv-01157-J-32MCR, slip op. at 4 (M.D. Fla. Nov. 2, 2018), Doc. 62 (approving $1,995,000 fee); *In re Henry Schein, Inc. Derivative Litig.*,

considering the *Ramey* factors, the time spent by counsel on this case, similar awards, and the outcome, the Court approves the 1.2 multiplier.

Accordingly, Shareholders' Counsel's request for $950,000 in fees and expenses is approved and granted.

## IV. INCENTIVE AWARD

Plaintiff last requests that the Court approve incentive awards for him and Coahn. The incentive award is part of the Settlement Agreement. Pursuant to the Settlement Agreement:

> Shareholders [Graham and Coahn] may apply for Court-approved incentive awards in the amount of $2,500 each (the "Incentive Awards"). The Incentive Awards shall be funded from the Fee Award. Defendants shall take no position on the Incentive Awards."

(Settlement Agreement at § 5.6).

There is no clear law on incentive awards in the Sixth Circuit. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013) ("Our court has never approved the practice of incentive payments to class representatives, though in fairness we have not disapproved the practice either."); *Hadix*, 322 F.3d at 897 ("This court has never explicitly passed judgment on the appropriateness of incentive awards."). However, the Sixth Circuit has raised concerns with "the propriety of incentive awards," given that the awards may be "in fact 'a *disincentive* for the [named] class members to care about the

---

No. 19-cv-06485-RLM, slip op. at ¶ 14 (E.D.N.Y. Dec. 16, 2020), Doc. 36 (approving $1.85 million fee); *van der Gracht de Rommerswael v. Auerbach*, No. SACV 18-00236 AG (JCGx), 2019 WL 7753447, at *2, *4 (C.D. Cal. Jan. 7, 2019) (approving $1.175 million fee).

adequacy of relief afforded unnamed class members.'" *Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 311 (6th Cir. 2016) (quoting *In re Dry Max*, 724 F.3d at 722) (emphasis in original).

This is a more unusual case because the incentive award does not come from a common fund but would be awarded from the attorney fee award. "An incentive payment to come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected." *In re Cendant Corp.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002); *see also In re Presidential Life Sec. Litig.*, 857 F. Supp. 331, 337 (S.D.N.Y. 1994).

However, another district court in this circuit has raised concerns with such an incentive award in a case like this because derivative settlements do not benefit any individual shareholder directly, and providing incentive awards in such actions "could put named plaintiffs in a different position than the rest of the shareholders and could interfere with their ability to judge the settlement's fairness." *In re UnumProvident Corp. Derivative Litig.*, No. 1:02-CV-386, 2010 WL 289179, at *10 (E.D. Tenn. Jan. 20, 2010).

Moreover, incentive awards in a traditional class action are often awarded to the named plaintiff because of the diligence and risk required by the named plaintiff, such as answering discovery, being deposed, and remaining diligently informed throughout the litigation. *Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250 (S.D. Ohio 1991). Here, Graham reviewed the complaint and verified it and Coahn

38

made a demand on the Board. However, neither was faced with the risk of being investigated or deposed. And, although Graham and Coahn likely spent some energy working on this case and this action protects their and other shareholder's rights, "it does not appear they spent an exorbitant amount of time" litigating this action. *See In re UnumProvident*, 2010 WL 289179 at *9 (denying request for settlement award from attorney fee fund) (collecting cases).

Accordingly, having evaluated the circumstances in this case and the considerations and concerns of incentive awards as noted by other courts, the Court concludes an incentive award is not appropriate under the circumstances of this case.

## V. CONCLUSION

Based upon the foregoing, the motion for final approval of the settlement is **GRANTED.** Thomas Caracci's objections are **OVERRULED.** Plaintiff's request for an attorney fee award and expenses is **GRANTED.** Plaintiff's request for an incentive award is **DENIED**.

**IT IS SO ORDERED.**

Date: <u>September 15, 2021</u>         *s/Timothy S. Black*
                                               Timothy S. Black
                                               United States District Judge