# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| IN RE THE WENDY'S COMPANY | : | Case No. 1:16-cv-1153 |
| SHAREHOLDER DERIVATIVE | : | |
| ACTION | : | Judge Timothy S. Black |

## ORDER GRANTING PLAINTIFF JAMES GRAHAM'S MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE LITIGATION SETTLEMENT (Doc. 51)

This civil action is before the Court on Plaintiff James Graham's Motion for Preliminary Approval of Derivative Litigation Settlement (Doc. 51), as well as the parties' responsive memoranda (Docs. 55, 60, 61).

## I. BACKGROUND

### A. Underlying Case

In 2016, The Wendy's Company ("Wendy's" or the "Company") disclosed that certain of its franchises had fallen victim to cyber-attacks. (Doc. 50 at ¶¶ 3–4). After Wendy's disclosure, two shareholders—Plaintiffs James Graham ("Graham") and Thomas Caracci ("Caracci")—filed derivative actions on behalf of the Company.

Graham filed suit in late 2016 (*Graham* Action, Doc. 1); Caracci filed suit in early 2017 (*Caracci* Action, Doc. 3).[1] In their complaints, Graham and Caracci alleged that certain of Wendy's officers/directors ("Defendants") had breached their fiduciary duties

---

[1] The "*Graham* Action" refers to *Graham v. Peltz, et al.*, No. 1:16-cv-1153 (S.D. Ohio). The "*Caracci* Action" refers to *Caracci v. Brolick, et al.*, No. 1:17-cv-192 (S.D. Ohio). After their filing, the Court consolidated both actions under *In re The Wendy's Company Shareholder Derivative Action*, No. 1:16-cv-1153 (S.D. Ohio) (the "Consolidated Action"). All docket citations are to the Consolidated Action unless otherwise noted.

to the Company by failing to oversee the Company's cybersecurity processes. (*See id.*; Doc. 1).

While similar in many respects, Graham's and Caracci's complaints differed in one notable way (for the purposes of this Order): Caracci's complaint cited to documents containing Wendy's internal discussions about cyber risks (the "Section 220 Documents"), while Graham's complaint did not.[2] (*See Caracci* Action, Doc. 3; Doc. 1).

In March 2017, Defendants filed a motion to dismiss Graham's complaint. (Doc. 9). Thereafter, Defendants readied a motion to dismiss Caracci's complaint. (*See* Doc. 61 at 10). Defendants claimed that neither Graham nor Caracci had adequately alleged demand futility/proper claims. (*See id.* at 9–10; *see also* Doc. 61-1 at ¶ 16).

## B. Leadership Dispute

In May 2017, Graham and Caracci (or, more precisely, their counsel) engaged in a protracted leadership dispute. Both wanted to consolidate their actions; but neither could agree on a leadership structure. (Doc. 55-2 at ¶¶ 3, 9). Graham's counsel wanted to share the case equally; Caracci's counsel wanted to take the lead role. (*Id.*)

Graham's counsel claimed that it was entitled to an equal role, because it had the experience/relationship necessary to "deliver a settlement." (*Id.* at ¶ 3). Graham's counsel noted that it had just resolved a large cybersecurity action (the *Home Depot* Action),[3] opposite the same counsel retained by Defendants. (*Id.*; Doc. 60-1 at ¶ 19).

---

[2] The Section 220 Documents are named after 8 Del. C. § 220, authorizing their request/receipt.

[3] The "*Home Depot* Action" refers to *In re The Home Depot, Inc. S'holder Derivative Litig.*, No. 1:15-cv-2999 (N.D. Ga.).

Caracci's counsel claimed that it was entitled to the lead role, because Caracci's complaint was superior to Graham's. (Doc. 55-2 at ¶ 4). Caracci's counsel noted that Caracci's complaint (unlike Graham's) contained citations to the Section 220 Documents. (*Id.* (asserting that Caracci's complaint had "a stronger chance of surviving" dismissal)).

Discussions between counsel failed to result in a compromise. (Doc. 60-1 at ¶ 20). Accordingly, in May 2017, the parties filed competing motions to consolidate the cases/appoint lead counsel. (Docs. 17, 18). The Court consolidated the cases forthwith but took the lead counsel issue under advisement. (*See Caracci* Action, Not. Order, June 12, 2017).

### C. Settlement Discussions

#### 1. *The 2017 Mediation*

In May/June 2017, Graham, Caracci, and Defendants agreed to participate in a mediation. (Doc. 60-1 at ¶ 26). All parties agreed that the mediation should occur in a two-part format, similar to that employed in the *Home Depot* Action: (1) an information session; followed by (2) a negotiation session. (*Id.*; Doc. 61-1 at ¶ 6). The parties selected Jed Melnick ("Melnick") as mediator. (Doc. 60-1 at ¶ 26). And the parties invited Michael Coahn ("Coahn"), another Wendy's shareholder, to participate. (*Id.*)

Prior to the information session, Defendants informed the other parties that they "expected to reach a comprehensive settlement." (Doc. 61-1 at ¶ 16). That is, Defendants informed the other parties that "any settlement agreement must include an agreement both as to governance reforms and as to [attorney] fees." (*Id.*) Moreover, Defendants stated that, given the posture of the instant case, they "should work towards a

settlement in keeping with the settlement reached in [t]he *Home Depot* [Action]."  (*Id.* (italics removed)).  Caracci voiced no objections.  (*Id.* at ¶ 17).

The information session took place in July 2017.  (Doc. 60-1 at ¶ 26).  As part of the information session, Defendants provided Graham, Caracci, and Coahn with certain confidential documents—including the Section 220 Documents—subject to certain confidentiality restrictions.[4]  (*Id.* at ¶ 27; *see also* Doc. 55-2 at ¶ 11).

The negotiation session never followed.  (Doc. 55-2 at ¶ 16).  Prior to its occurrence, Defendants received Caracci's attorney fee disclosure (pursuant to Local Rules).  (Doc. 61-1 at Ex. F).  Caracci's disclosure estimated that, as of July 2017, his counsel had already incurred <u>over $525,000</u> in attorney fees.[5]  (*Id.* at ¶ 23, Ex. F).

Upon receipt of Caracci's disclosure, Defendants reiterated their position "that— while [Defendants] intended to first negotiate and reach an agreement in principal as to potential governance reforms before discussing attorney[] fees—Defendants and their insurance carriers would not finalize a settlement without an agreement as to [attorney] fee amount."  (Doc. 61-1 at ¶ 26).  Defendants explained that their "settlement position was informed in part by the settlement reached in [t]he *Home Depot* [Action], including with respect to the amount of attorney[] fees."  (*Id.* (italics removed)).  Thus, Defendants

---

[4] The parties signed two confidentiality agreements; both prevented them from using the confidential documents outside the context of the mediation.  (Doc. 61-1 at Exs. A–B).

[5] To be precise, Caracci's disclosure included both attorney fees and costs.  (Doc. 61-1 at Ex. F). In this Order, for simplicity, the Court uses "attorney fees" as a catchall term that includes costs.

informed Caracci that they were "troubled by the [attorney] fees . . . amassing in the matter." (*Id.*; *accord* Doc. 55-2 at ¶ 12).

Following these disclosures, Caracci's counsel expressed, for the first time, misgivings about proceeding with Defendants' "comprehensive settlement."[6] (Doc. 55-2 at ¶ 13). Caracci's counsel stated that Caracci would only proceed with mediation if the parties could negotiate an "appropriate" attorney fee award after the substantive terms of the settlement agreement were finalized. (*Id.*) In that regard, Caracci's counsel subsequently offered to cap attorney fees at $3 million. (Doc. 61-1 at ¶ 30). After this exchange, negotiations stalled. (*See* Doc. 61-1 at ¶¶ 32–33).

### 2. *The Settlement Demand*

In August 2017, Coahn's counsel reached out to Graham's counsel and Caracci's counsel to see whether either would be interested in working together as equals "to explore the potential for, and possibly reach, a settlement of the Company's derivative claims." (Doc. 40-2 at ¶¶ 6–7). Graham's counsel agreed; Caracci's counsel did not. (*Id.*)

Thereafter, in December 2017, Graham and Coahn sent a settlement demand to Defendants (without Caracci). (Doc. 61-1 at ¶ 35). Defendants were receptive to the settlement demand. (*Id.*) As a result, Graham, Coahn, and Defendants scheduled a second mediation. (*Id.* at ¶¶ 35–36).

---

[6] Caracci's counsel explained that Defendants' "comprehensive settlement" would place counsel's interests adverse to those of Wendy's shareholders—Caracci's counsel might be tempted to walk away from a settlement that properly benefitted Wendy's shareholders, if the settlement did not adequately provide for attorney fees. (Doc. 55-2 at ¶ 13).

In January 2018, Defendants informed Caracci that they were engaged in negotiations with Graham and Coahn.  (*Id.* at ¶ 35).  Caracci did not seek to participate in the negotiations.  (*See id.*; *see also* Doc. 32).  Instead, Caracci filed a motion for a status conference.  (Doc. 32).

In his motion, Caracci notified the Court that Graham, Coahn, and Defendants were working together to resolve this case without him.  (Doc. 32-1 at 4).  Additionally, in his motion, Caracci asked the Court to provide him with a status update on the pending motions to appoint.  (*Id.*)

Upon its receipt of Caracci's motion, the Court did not immediately schedule a status conference.  (Not. Order, Feb. 20, 2018).  Instead, the Court first allowed Graham, Coahn, and Defendants to proceed with negotiations.  (*Id.* (setting the status conference for late February)).

### 3.  *The 2018 Mediation*

In February 2018, Graham, Coahn, and Defendants (the "Settling Parties") mediated their case.  (Doc. 61-1 at ¶ 38).  A new mediator, Ralph Levy ("Levy"), oversaw the negotiations.  (*Id.*)  Levy was the same mediator that Graham's counsel and Defendants' counsel had used when they had resolved the *Home Depot* Action.  (Doc. 60-2 at ¶ 6).

The mediation lasted over eight hours.  (*Id.* at ¶ 10).  During the course of the mediation, the Settling Parties negotiated Wendy's corporate governance reforms.  (*Id.*)  At the conclusion of the mediation, the Settling Parties reached a material agreement as to the same, subject to the approval of Wendy's board.  (*Id.*)

Among other things, the Settling Parties agreed that:

- (1) Wendy's board of directors would maintain a technology committee, which will oversee Wendy's cybersecurity-related matters.

- (2) Wendy's managers would report to the technology committee, on a regular basis, regarding the Company's cybersecurity programs/risks.

- (3) Wendy's would maintain (and/or continue to maintain) various cybersecurity systems, teams, and measures, to protect against future cyberattacks.

(*See* Doc. 51-1 at 17–20, 42–44).

After the Settling Parties reached a material agreement as to the corporate governance reforms, Graham/Coahn made an initial attorney fee demand. (Doc. 60-2 at ¶ 10). Defendants did not respond to Graham/Coahn's initial attorney fee demand that day. (*Id.*)

Instead, the Settling Parties negotiated attorney fees over the next six weeks— through Levy. (*Id.* at ¶ 11). Negotiations concluded when, in March 2018, Levy made a mediator's proposal (of $950,000 to Graham/Coahn's counsel, and up to $200,000 to other counsel) which all the Settling Parties accepted. (*Id.* at ¶ 12; Doc. 51-1 at 22–23).

**D. Leadership Order**

In April 2018, the Settling Parties informed the Court that they had reached an agreement to resolve the case. (Doc. 38 at 1). Thereafter, in December 2018, the Court issued a decision on the parties' motions to appoint (the "Leadership Order"). (*See* Doc. 49; *see also* Min. Entry, Dec. 12, 2018).

In the Leadership Order, the Court appointed Graham's counsel as lead counsel. (Doc. 49). The Court noted that, while both Graham's counsel and Caracci's counsel

were highly qualified, the circumstances narrowly favored Graham's counsel, for three reasons. (*Id.* at 5–6).

First, Graham's counsel had made an effort to cooperate with the other parties' counsel (*i.e.*, both Caracci's counsel and Coahn's counsel). (*Id.* at 5). Second, Graham's counsel had acquired "relevant and helpful" experience by litigating the *Home Depot* Action. (*Id.* at 5–6). And third, Graham's counsel had retained an impressive cyber-security expert. (*Id.* at 6).

Moreover, the Court rejected Caracci's argument that his counsel should be appointed as lead counsel simply because his complaint referenced the Section 220 Documents (while Graham's complaint did not). (*Id.* at 7 (refusing to put "great weight in any differences between" the parties' complaints)).

At the conclusion of the Leadership Order, the Court granted Graham leave to file a consolidated complaint on behalf of all Wendy's shareholders. (*Id.* at 9). And the Court established a procedure by which Graham could file a motion for preliminary approval and Caracci could file an opposition to the same. (*Id.* at 10).

**E. Instant Motion**

On February 14, 2019, Graham filed a motion for preliminary approval. (Doc. 51). In his motion, Graham asks the Court to approve—from a preliminary standpoint— the settlement agreement drafted by the Settling Parties after the conclusion of the 2018 mediation (the "Settlement Agreement"). (*Id.*; *see also* Doc. 55-1).

On March 15, 2019, Caracci filed an opposition to the motion for preliminary approval. (Doc. 55). In his opposition, Caracci claims that the Court should deny the

motion for preliminary approval, because the Settlement Agreement is the product of collusion. (*Id.* at 2).

On April 12, 2019, both Graham and Defendants filed replies in support of the motion for preliminary approval. (Docs. 60, 61). In their replies, Graham and Defendants vigorously dispute Caracci's claim that the Settlement Agreement is the product of collusion. (Doc. 60 at 1; Doc. 61 at 7).

Graham, Caracci, and Defendants have submitted sworn declarations in support of their competing positions, detailing the manner in which the negotiations at-issue here played out. (Docs. 55-1, 55-2, 60-1, 61-1). Notably, Levy has also submitted a sworn declaration, detailing the same. (Doc. 60-2).

In his sworn declaration, Levy avers as follows:

> From what I witnessed and in my opinion as a mediator with approximately two years of such experience in private practice and approximately seven years of mediation experience at JAMS, the parties at all times engaged at arms-length. Throughout the negotiations on the terms of the underlying settlement and on the attorney[] fees, I did not witness or perceive anything that would lead me to believe that the parties, their counsel, or Wendy's D&O insurer were engaging in collusive or inappropriate conduct. I declare under penalty of perjury that the foregoing is true and correct.

(*Id.* at ¶ 13).

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 23.1, the settlement of a derivative action requires court approval. Fed. R. Civ. P. 23.1(c); *see generally* 7C Mary Kane, *Fed. Prac. & Proc. Civ.*, at § 1839 (3d ed. 2019).

"In evaluating derivative action settlements, courts have borrowed from the law governing class actions under Rule 23." *City of Plantation Police Officers' Employees' Ret. Sys. v. Jeffries*, No. 2:14-CV-1380, 2014 WL 7404000, at *5 (S.D. Ohio Dec. 30, 2014); *accord In re: Regions Morgan Keegan Sec.*, No. 2:08-CV-2260, 2015 WL 11145134, at *2 (W.D. Tenn. Nov. 30, 2015) ("The procedure for approving settlements in derivative actions is the same as class actions.").

Thus, obtaining court approval is a three-step process: first "the court must preliminarily approve the proposed settlement"; second "members of the class must be given notice of the proposed settlement"; and third, "after holding a hearing, the court must give its final approval of the settlement." *Robinson v. Ford Motor Co.*, No. 1:04-CV-844, 2005 WL 5253339, at *3 (S.D. Ohio June 15, 2005) (citing *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983)).

At the preliminary approval stage—the stage at issue here—the Court must make a preliminary assessment of whether the proposed settlement is fair, reasonable, and adequate. *Regions*, 2015 WL 11145134, at *3. In making this preliminary assessment, the court should not act as a "rubber stamp"; but neither should the court substitute its opinion for the parties' opinion. *City of Plantation Police Officers' Employees' Ret. Sys. v. Jeffries*, No. 2:14-CV-1380, 2014 WL 12780342, at *3 (S.D. Ohio Sept. 26, 2014).

Instead, the court should consider whether the proposed settlement is sufficiently fair, from both a substantive standpoint and a procedural standpoint, to warrant the issuance of notice. *See Milburn v. PetSmart, Inc.*, No. 1:18-CV-535, 2019 WL 1746056, at *8 (E.D. Cal. Apr. 18, 2019); *Ortega v. Uber Techs. Inc.*, No. 1:15-CV-7387, 2018 WL

4190799, at *4 (E.D.N.Y. May 4, 2018); *see also* 4 William Rubenstein, *Newberg on Class Actions*, at § 13:13 (5th ed. 2019).

As is often stated by courts considering motions for preliminary approval:

> "If the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls with[in] the range of possible approval, then the [c]ourt should direct that notice be given to the class members of a formal fairness hearing, at which evidence may be presented in support of and in opposition to the settlement."

*Jeffries*, 2014 WL 12780342, at *3 (quoting *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1015–16 (S.D. Ohio 2001)).

Ultimately, whether to grant a motion for preliminary approval is within the sound discretion of the trial court. *Bowling v. Pfizer*, 144 F. Supp. 3d 945, 952 (S.D. Ohio 2015); *accord McDannold v. Star Bank, N.A.*, 261 F.3d 478, 488 (6th Cir. 2001).

## III.  ANALYSIS

In this case, the Court concludes that the Settlement Agreement meets the standard for preliminary approval.  This is because the Settlement Agreement is sufficiently fair, from both (A) a substantive standpoint and (B) a procedural standpoint, to warrant the issuance of notice.  Accordingly, the Court concludes that (C) notice to Wendy's shareholders is proper as set forth *infra*.

### A. Substantive Fairness

As an initial matter, the Settlement Agreement is sufficiently fair, from a substantive standpoint, to warrant the issuance of notice.

11

At the preliminary approval stage, the Court is not required to undertake a full fairness review. *Regions*, 2015 WL 11145134, at *3. The Court is merely required to determine whether the proposed settlement falls within the "range of what a fair negotiation . . . would produce." *Jeffries*, 2014 WL 12780342, at *3.

In making this determination, the Court should consider whether the proposed settlement contains any obvious defects, and whether the proposed settlement contains any preferential treatment. *See id.*; *accord* Fed. R. Civ. P. 23(e). However, the Court should not "substitut[e] its own opinion" for that of the parties. *Jeffries*, 2014 WL 12780342, at *3.

Moreover, "a preliminary fairness assessment 'is not to be turned into a trial or rehearsal for trial on the merits,' for 'it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.'" *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 350 (N.D. Ohio 2001) (quoting *Officers for Justice v. Civil Serv. Comm'n of the City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)).

Here, the Settlement Agreement provides Wendy's shareholders with some significant benefits. It requires the Company to implement a series of cybersecurity reforms, designed to target the very issues giving rise to this derivative litigation. (*See* Doc. 51-1 at 17–20, 42–44 (requiring Wendy's to, *inter alia*: maintain a technology committee which will oversee cybersecurity matters; report to the technology committee on all cybersecurity-related programs/risks; and maintain (and/or continue to maintain) various other cybersecurity systems, teams, and measures)). Moreover here, the attorney

fees proposed do not exceed the bounds of reason.  To the contrary, they resemble those approved in the *Home Depot* Action (an analogous case).  (Doc. 55-2 at Ex. H).

The Court does not see any obvious defects/preferential treatment in the Settlement Agreement's terms.  And, notably, Caracci does not identify any in his opposition.  (*See* Doc. 55).  Caracci merely suggests, in passing, that the Settlement Agreement's terms could be better.  (*Id.* at 18 (claiming that the Settlement Agreement "requires almost no improvements to Wendy's existing practices").  However, it is not the Court's job, at this juncture, to engage in such speculation.[7]  *Officers*, 688 F.2d at 625 (stating that a "proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators").  Caracci is free to raise any substance-related concerns he has at the settlement hearing.

In light of the foregoing, the Settlement Agreement is sufficiently fair, from a substantive standpoint, to warrant the issuance of notice to Wendy's shareholders.

---

[7] This is especially true, as it appears that plaintiffs in data breach derivative litigation matters face an uphill battle.  *See, e.g.*, *In re The Home Depot, Inc. S'holder Derivative Litig.*, 223 F. Supp. 3d 1317 (N.D. Ga. 2016) (dismissing a data breach derivative litigation matter); *Palkon v. Holmes*, No. 2:14-CV-1234, 2014 WL 5341880 (D.N.J. Oct. 20, 2014) (dismissing a data breach derivative litigation matter); *accord* 1 Gerald Peake, *Data Sec. & Privacy Law*, at § 8:55 (2019) (stating that "data breach derivative litigation matters are challenging for shareholders to pursue"); Neil Popović, *Cloud Computing Legal Deskbook*, at § 20:14 (2019) (noting that "early efforts to pursue [data breach] derivative [litigation] claims have foundered").  It is hard to say how, under such circumstances, such plaintiffs should weigh the risks of continued litigation against the benefits of existing concessions.  *Jeffries*, 2014 WL 12780342, at *3 (stating that the court should not substitute its opinion for the parties' in the context of a motion for preliminary approval).

## B. Procedural Fairness

### 1. *Preliminary Analysis*

Moreover, the Settlement Agreement is sufficiently fair, from a procedural standpoint, to warrant the issuance of notice.

At the preliminary approval stage, the court must evaluate whether the proposed settlement "'appears to be the product of serious, informed, non-collusive negotiation.'" *In re Polyurethane Foam Antitrust Litig.*, No. 1:10-MD-2196, 2012 WL 12868246, at *4 (N.D. Ohio Jan. 23, 2012) (quoting *In re Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997)).

Absent evidence to the contrary, courts <u>presume</u> the absence of fraud or collusion. *See id.*; *Merkner v. AK Steel Corp.*, No. 1:09-CV-423, 2011 WL 13202401, at *2 (S.D. Ohio Jan. 10, 2011); *see also In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1016 (S.D. Ohio 2001) ("[C]ourts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." (citation omitted)).

In fact, "[t]he participation of an independent mediator in settlement negotiations <u>virtually [e]nsures</u> that the negotiations were conducted at arm's length and without collusion between the parties." *Bert v. AK Steel Corp.*, No. 1:02-CV-467, 2008 WL 4693747, at *2 (S.D. Ohio Oct. 23, 2008) (emphasis added); *see also Arledge v. Domino's Pizza, Inc.*, No. 3:16-CV-386, 2018 WL 5023950, at *2 (S.D. Ohio Oct. 17, 2018) (same); *Swigart v. Fifth Third Bank*, No. 1:11-CV-88, 2014 WL 3447947, at *2 (S.D. Ohio July 11, 2014) (same).

Here, according to the declarations submitted, the Settling Parties engaged in hard-fought negotiations through highly experienced counsel.  (*See generally* Docs. 60-1, 60-2, 61-1).  These negotiations occurred over the course of several weeks (between February 2018 and March 2018).  (Doc. 60-2 at ¶¶ 10–13).  And these negotiations occurred after the parties had engaged in an information session.  (*See* Doc. 60-1 at ¶ 27 (confirming that Defendants provided Graham, Caracci, and Coahn with confidential documents regarding Wendy's cybersecurity/the data breach—including the Section 220 Documents—as part of an information session)).

Moreover here, according to the declarations submitted, the Settling Parties conducted all negotiations through an independent mediator, who has sworn that the Settling Parties engaged at arms-length at all times.  (Doc. 60-2 at ¶ 13 (confirming that Levy "did not witness or perceive anything that would lead [him] to believe that the [Settling] [P]arties, their counsel, or Wendy's D&O insurer were engaging in collusive or inappropriate conduct")).  Under such circumstances, a <u>strong</u> presumption arises that the Settlement Agreement is the product of serious, informed, and non-collusive negotiations.  *Bert*, 2008 WL 4693747, at *2; *Telectronics*, 137 F. Supp. 2d at 1016.

In light of the foregoing, the Settlement Agreement is sufficiently fair, from a procedural standpoint, to warrant the issuance of notice to Wendy's shareholders.

### 2. *Caracci's Counterarguments*

Notwithstanding the foregoing, Caracci claims that the Settling Parties have engaged in "collusion."  (*See* Doc. 55 at 8–16).  However, as set forth *infra*, the Court does not find any of Caracci's arguments in support of this claim persuasive.

15

a.  <u>Reverse auction</u>

First, Caracci argues that the Settling Parties colluded, because they engaged in a "reverse auction."  (Doc. 55 at 9–10).  As Caracci correctly notes, a reverse auction is the practice whereby "'the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant.'"  (*Id.* at 9 (quoting *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir. 2002)); *see also Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1099 (9th Cir. 2008) (discussing the reverse auction concept).

Courts are, rightfully, wary of reverse auctions, because they allow "ineffectual lawyers" to "sell out" their clients "for generous attorney[] fees."  *Reynolds*, 288 F.3d at 282.  However, an objector cannot simply say the words "reverse auction" and expect to invalidate a proposed settlement.  *Negrete*, 523 F.3d at 1099.  Instead, an objector must point to some evidence of "underhanded activity."  *Id.*  Otherwise, the "reverse auction argument would lead to the conclusion that no settlement could ever occur in the circumstances of parallel or multiple class actions . . . ."  *Id.* at 1100 (citation omitted).

Here, Caracci's argument fails for at least two reasons.

As an initial matter, this case does not bear the hallmarks of a normal reverse auction.  Defendants did not negotiate with Graham/Coahn <u>because</u> Graham/Coahn were willing to accept weak settlement terms in exchange for generous attorney fees.  To the contrary, Defendants negotiated with Graham/Coahn <u>because</u> Caracci's counsel was <u>only</u> willing to negotiate with Defendants under conditions that <u>allowed for</u> generous attorney

16

fees. (Doc. 55-2 at ¶¶ 12, 16; Doc. 61-1 at ¶¶ 30–32). Indeed, the parties' 2017 mediation stalled because Caracci's counsel refused to engage in negotiations unless the negotiations ensured Caracci's counsel the ability to seek up to $3 million in attorney fees. (Doc. 61-1 at ¶¶ 30–32). In effect, Caracci asks the Court to hold that a reverse auction exists simply because the Settling Parties resolved this case without either Caracci or his counsel's exorbitant attorney fee demands. This the Court will not do.

Moreover, Caracci has not pointed to any evidence of underhanded activity. To be sure, Caracci has informed the Court that Graham's counsel and Defendants' counsel settled this case with the same mediator they used in the *Home Depot* Action. (Doc. 55 at 11, 15). And Caracci has informed the Court that the terms of the Settlement Agreement in this case resemble those of the settlement agreement in the *Home Depot* Action. (*Id.* at 10). However, neither of these points establishes collusion. The Court remembers the practice of law. Accordingly, the Court remembers that attorneys occasionally face off against each other in multiple different cases; that attorneys occasionally employ the same mediators in multiple different cases; and that attorneys occasionally use previous litigation results as precedent in present settlement discussions.

For both these reasons, Caracci's first argument is not availing.

      b.  <u>Ability to litigate</u>

Second, Caracci argues that the Settling Parties colluded, because Graham could not have litigated this case against Defendants. (Doc. 55 at 12–14). Interestingly, Caracci does not argue that Graham's complaint faced any procedural-/preclusion-related hurdles. (*See id.*). Instead, Caracci argues that, absent any reference to the Section 220

Documents, Graham's complaint "was woefully deficient" and "clearly subject to dismissal." (*Id.* at 12–13 (claiming that Graham had "zero leverage" because, absent any reference to the Section 220 Documents, Graham's complaint could not have survived Defendants' motion to dismiss)).

Of course, courts should be wary of settlement agreements reached by parties who cannot litigate—and thus have no bargaining power. *See, e.g.*, *Prezant v. De Angelis*, 636 A.2d 915, 919 (Del. 1994) (indicating that a settlement agreement, reached by a party who "could not realistically have hoped to try [a] case but only to settle it with the further hope of receiving a fee award," was worthy of suspicion).

However, on the Court's review, this case does not present such a situation (*i.e.*, one in which a party cannot litigate).

As an initial matter, Caracci's summary accusation—that Graham's complaint "was woefully deficient" because it did not reference the Section 220 Documents—is not very persuasive. The Court acknowledges that, in some instances, a complaint that references Section 220 documents is superior to one that does not. (*See* Doc. 49 at 7). However, Caracci has not cited (and the Court has not found) any cases holding that a complaint <u>must</u> reference Section 220 Documents in order to maintain a derivative action. To the contrary, all the cases reviewed by the Court refer to Section 220 as <u>one</u> of the tools a plaintiff can/should use before commencing a derivative action. *See, e.g.*, *Rales v. Blasband*, 634 A.2d 927, 934 n.10 (Del. 1993); *cf. Iron Workers Mid-S. Pension Fund on Behalf of Caterpillar Inc. v. Oberhelman*, No. 1:13-CV-1104, 2014 WL 5801508, at *3 (C.D. Ill. Nov. 7, 2014).

Moreover, Graham may well have survived Defendants' motion to dismiss. While Caracci claims that Graham's complaint was "clearly subject to dismissal," the Court did not issue a decision on Defendants' motion to dismiss. Thus, there is no assurance that the Court would have dismissed Graham's complaint—with prejudice or otherwise. Of course, the words "with prejudice" are of particular import. This is because, even if Defendants had prevailed on their motion to dismiss, the Court could have granted Graham leave to amend, and (thus) permitted Graham to proceed in litigation. *See, e.g.*, *Ash v. McCall*, No. 17132, 2000 WL 1370341, at *16 (Del. Ch. Sept. 15, 2000) (dismissing certain claims without prejudice, so that plaintiffs could "replead and allege additional, particularized facts that would support a demand futility determination").[8]

Notably, this case is easily distinguishable from the one cited in Caracci's opposition memorandum: *Prezant*, 636 A.2d at 915. In *Prezant*, a plaintiff filed a class action lawsuit against a corporate defendant in Delaware, notwithstanding the fact that there was a near-identical lawsuit pending against the same defendant in Illinois. *Id.* at 918. Shortly thereafter, the plaintiff settled the Delaware lawsuit, thereby ending the Illinois lawsuit as well. *Id.* On review, the Supreme Court of Delaware indicated that the plaintiff's decision to file then quickly settle the Delaware lawsuit—which was plainly

---

[8] Caracci makes much ado about the fact that Graham could not have referenced the Section 220 Documents in any amended complaint because Graham had signed confidentiality agreements stating that he would only use the Section 220 Documents in mediation. (Doc. 55 at 13; Doc. 61-1 at Exs. A–B (containing the confidentiality agreements so stating)). But this argument is not persuasive. As stated, Caracci has not cited (and the Court has not found) any cases holding that a complaint must reference Section 220 Documents in order to maintain a derivative action. And the Court will not speculate (as Caracci asks it to speculate) that Graham could not have produced an amended complaint, that would have survived a motion to dismiss, without the Section 220 Documents.

deficient under Delaware law—raised collusion-related concerns.[9] *Id.* at 919–20. This case simply does not involve either the egregious misconduct or the plain preclusion present in *Prezant*.

For all these reasons, Caracci's second argument is not availing.

      c.  <u>Negotiation of fees</u>

Third, Caracci argues that the Settling Parties colluded, because the Settling Parties negotiated substantive relief and attorney fees contemporaneously. (Doc. 55 at 14–15). Notably, Caracci does not claim that the Settling Parties actually discussed substantive relief and attorney fees together in the 2018 mediation. (*See id.*). Instead, Caracci claims that, by questioning the amount of attorney fees his counsel incurred, and by referencing the *Home Depot* Action as precedent, in 2017, Defendants "conditioned" further negotiations on an agreement to *Home Depot*-style attorney fees.[10] (*Id.* at 13).

To be sure, courts have noted that ethical problems can arise when parties negotiate substantive relief and attorney fees contemporaneously. *See Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 302 (6th Cir. 2016) (Clay, J., dissenting); *but see Ayers v. Thompson*, 358 F.3d 356, 375 (5th Cir. 2004) (stating, while considering the

---

[9] As explained in *Prezant*, Delaware courts "normally stay after-filed suits when previously-filed suits stating similar claims are pending in another court." *Prezant*, 636 A.2d at 919 (noting further that, under this rule, the plaintiff "could not realistically have hoped to try [his] case [in Delaware] but only to settle it with the further hope of receiving a fee award").

[10] As Caracci puts it: "Defendants specifically conditioned continued negotiation of the settlement on an agreement on the amount of [attorney] fees. After [their] receipt of [Caracci's attorney fee disclosure] . . . , Defendants indicated, in no uncertain terms, that future negotiations were contingent upon [Caracci's] agreeing to [attorney] fees akin to what was awarded in the *Home Depot* [Action] . . . ." (Doc. 55 at 13).

propriety of an attorney fees provision in a class action settlement agreement, that the United States Supreme Court has "declined to prohibit [the] simultaneous negotiation of liability and fees" (citing *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 453 n.15 (1982))); *Shlensky v. Dorsey*, 574 F.2d 131, 150 (3d Cir. 1978) (allowing the simultaneous negotiation of substantive relief and attorney fees in the context of derivative actions).

However, on the Court's review, "simultaneous negotiations" did not occurr in this case.

As an initial mater, the Settling Parties have filed declarations asserting that they did not engage in simultaneous negotiations. Graham's counsel, Defendants' counsel, and Levy have all sworn, under penalty of perjury, that the Settling Parties negotiated attorney fees <u>after</u> they reached a material agreement as to substantive relief. (Doc. 60-1 at ¶¶ 30–31; Doc. 60-2 at ¶¶ 10–12; Doc. 61-1 at ¶¶ 38–39); *Gascho v. Glob. Fitness Holdings, LLC*, No. 2:11-CV-436, 2014 WL 1350509, at *25 (S.D. Ohio Apr. 4, 2014) ("The risk of collusion is also lessened in this action because the parties negotiated the payment of attorney[] fees and costs after having reached agreement on the relief to the Class and Subclasses."), *report and recommendation adopted*, No. 2:11-CV-436, 2014 WL 3543819 (S.D. Ohio July 16, 2014), *aff'd*, 822 F.3d 269 (6th Cir. 2016).

Moreover, Caracci's argument, that Defendants "conditioned" further settlement negotiations on an agreement to *Home Depot*-style attorney fees, is a little disingenuous. True, Defendants questioned Caracci's attorney fees and referenced the *Home Depot* Action in 2017. (Doc. 61-1 at ¶ 26). However, on the Court's review, Defendants did

not do so to secure a specific amount of attorney fees. Defendants did so because, at the time—*i.e.*, after largely: (1) filing a derivative complaint; (2) litigating a leadership dispute; and (3) prepping for a mediation—Caracci's counsel had already incurred <u>over half a million dollars</u> in attorney fees. (*Id.* at ¶ 23). Defendants' distress about these attorney fees does not evidence collusion; it evidences a desire to engage in good faith negotiations in line with analogous precedent (for *e.g.*, the *Home Depot* Action).[11]

Notably, this case does not present the ethical concern typically associated with simultaneous negotiation cases. In the typical simultaneous negotiation case, the ethical concern is that the plaintiff will trade exorbitant attorney fees (on the part of its counsel) for minimal substantive relief (on the part of its corporation). *See Weissman v. All. Capital Mgmt. Corp.*, 650 F. Supp. 101, 104 (S.D.N.Y. 1986). But here, Caracci does not argue that the Settling Parties traded exorbitant attorney fees (on the part of Graham/Coahn) for minimal substantive relief (on the part of Wendy's); Caracci argues that the Settling Parties refused to negotiate with his counsel because his counsel's

---

[11] The Court does not take issue with the Settling Parties' reference to the *Home Depot* Action as one of the means by which to gauge the "parameters" of an appropriate settlement. As stated, the Court remembers the practice of law; thus, the Court remembers that counsel occasionally use past litigation results as precedent for present settlement discussions. *Cf. Regions*, 2015 WL 11145134, at *4 (granting a motion for preliminary approval after stating as follows: "The Derivative Settlement Agreement falls within the range of possible approval. This Court approved a comparable settlement for the Closed-End Funds in this litigation."); 3 John L. Warden, *et al.*, *Bus. & Com. Litig. Fed. Cts.*, at § 20:30 (4th ed. 2019) ("As a practical matter, counsel [in derivative actions] frequently discuss the 'parameters' of the [attorney] fee issue before concluding settlement terms, but counsel should be able to establish . . . that the settlement terms were agreed to prior to bargaining over the details of the [attorney] fee issue and reaching any agreement on [attorney] fees.").

attorney fee expectations were too <u>high</u>. The Court will not find evidence of collusion under such circumstances.

For all these reasons, Caracci's third argument is not availing.

    d.  <u>Exclusion of Caracci</u>

Fourth (and finally), Caracci argues that the Settling Parties colluded, because they "excluded" him from negotiations. (Doc. 55 at 16). According to Caracci, the Settling Parties' decision to proceed with the 2018 mediation, with Graham (the "favored adversary") instead of Caracci, "points to collusion." (*Id.*)

Certainly, courts have held that the exclusion of a significant party from a settlement negotiation can indicate collusion. *See, e.g.*, *In re MAXXAM, Inc.*, 659 A.2d 760, 776–77 (Del. Ch. 1995) ("Although the exclusion of a significant party litigant from the settlement negotiations will not, in and of itself, invalidate a proposed settlement, that approach, because of its inherent potential for abuse, will cause the settlement to be carefully scrutinized.").

But here, there is one big problem with Caracci's argument: <u>the Settling Parties did not exclude him</u>.

The Settling Parties repeatedly asked Caracci to proceed in a cooperative fashion. (*See* Doc. 49 at 5). For example, in March 2017, Graham's counsel asked Caracci's counsel to work together collectively to resolve this case (Doc. 60-1 at ¶¶ 17–18); and, in August 2017, Coahn's counsel asked Caracci's counsel the same question (Doc. 40-2 at ¶¶ 6–7). But Caracci's counsel repeatedly turned down these offers—because Caracci's counsel did not want to share this case equally. (Doc. 60-1 at ¶ 19; Doc. 55-2 at ¶ 17). In

light of this fact, the Settling Parties did not exclude Caracci from the 2018 mediation; Caracci (through counsel) excluded himself.[12]

For all these reasons, Caracci's fourth (and final) argument is not availing.

### C. Notice Issuance

As the Settlement Agreement meets the standard for preliminary approval, notice to Wendy's shareholders is proper as set forth *infra*.

"Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders."  Fed. R. Civ. P. 23.1(c); *see also In re Gen. Tire and Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984); *Regions*, 2015 WL 11145134, at *5; *accord* Kane, *supra*, at § 1839.

The notice need not be exhaustive/comprehensive; rather, it must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Gen. Tire*, 726 F.2d at 1086 (citation omitted).  In other words, the notice should simply "provide the shareholders with enough information to permit them to make a rational decision [about] whether to intervene in the settlement-approval process."  Kane, *supra*, at § 1839.

Here, Graham has submitted a proposed notice to the Court (the "Proposed Notice").  (Doc. 51-1 at Ex. B).  The Proposed Notice: summarizes this case and the terms of the Settlement Agreement; sets forth the procedures necessary to review the

---

[12] Notably, Caracci raises one additional argument.  Caracci argues that the Settling Parties colluded, because they engaged in pre-appointment negotiations.  (Doc. 55 at 10–11).  But the Court has already rejected this argument by appointing Graham's counsel as lead counsel with full knowledge that pre-appointment negotiations occurred.  (*See generally* Doc. 49).

Section 220 Documents and object to the Settlement Agreement; and provides specific information regarding the date, time, and place of the settlement hearing. (*See id.*).

Moreover, under the terms of the Settlement Agreement/Proposed Notice, Wendy's will: post the Settlement Agreement and Proposed Notice on the Investor Relations portion of Wendy's website; file a Form 8-K with the SEC with a link to the website posting; and publish a summary notice in *IBD Weekly Print*. (*See id.*).

The Court has carefully reviewed the Proposed Notice. And the Court concludes that the Proposed Notice complies, in both form and substance, with the Sixth Circuit standard regarding the provision of notice. That is, the Court concludes that the Proposed Notice provides Wendy's shareholders with enough information to permit them to make a rational decision about whether to intervene in the settlement-approval process. *Accord Gen. Tire*, 726 F.2d at 1086; Kane, *supra*, at § 1839.[13]

---

[13] Caracci raises several arguments to the contrary. The Court has considered all of them. But the Court does not find any of them persuasive. As one example, Caracci claims that the Proposed Notice should reference the claims in Caracci's original complaint. (Doc. 55 at 17). But Caracci's original complaint is no longer the operative pleading. (Doc. 50). Thus, the claims therein are no longer relevant. As another example, Caracci claims that the Proposed Notice should detail the Settlement Agreement's provisions regarding third-party attorney fees. (Doc. 55 at 17). But the Proposed Notice directs Wendy's shareholders to the actual Settlement Agreement (which will be available on Wendy's website). (Doc. 51-1 at 42). If Wendy's shareholders want to review the actual Settlement Agreement, on a provision-by-provision basis, they will be free to do so. As yet another example, Caracci claims that the Proposed Notice "fail[s] to inform [Wendy's] stockholders about" the Section 220 Documents. (Doc. 55 at 17). But the Proposed Notice both references the Section 220 Documents and affords Wendy's shareholders the opportunity to review them. (Doc. 51-1 at 46–47). The Court concludes that this is sufficient. The Proposed Notice does not need "to set forth every ground on which [Wendy's shareholders] might object to [the Settlement Agreement] . . . . All that the [Proposed] [N]otice must do is fairly apprise [them] of the terms of the [S]ettlement [Agreement] so that [they] may come to their own conclusions about whether the [S]ettlement [Agreement] serves their interests." *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 630 (6th Cir. 2007) (quotation marks and citation omitted).

While the Proposed Notice is proper, notice should not yet issue. On June 28, 2019, the Court held a discovery conference by telephone at which Caracci informed the Court that, if the Court granted Graham's motion for preliminary approval, Caracci intended to file a motion seeking leave to conduct certain discovery. (*See* Min. Entry and Not. Order, June 28, 2019). After the discovery conference by telephone, the Court issued a Minute Entry and Notation Order, allowing Caracci to "seek the Court's leave to conduct discovery, by way of an appropriate motion, after the Court issues a decision on [Graham's motion for preliminary approval]." (*Id.*)

The Court concludes that the Proposed Notice should not issue until after: Caracci has had the opportunity to file a motion for leave to conduct discovery; the Settling Parties have had the opportunity to respond to such a motion; and the Court has had the opportunity to issue an order on such a motion. This will ensure that the parties do not end up in a position where they are forced to object to the Settlement Agreement in a rushed manner in advance of the settlement hearing.

In light of the foregoing, the Court establishes the following briefing schedule for any motion for leave to conduct discovery.

| | |
|---|---|
| Motion for leave to conduct discovery: | **February 14, 2020** |
| Response in opposition to motion for leave to conduct discovery: | **March 6, 2020** |
| Reply in support of motion for leave to conduct discovery: | **March 20, 2020** |

The Court will establish a schedule regarding the issuance of the Proposed Notice to Wendy's shareholders (as well as the other events referenced on page 16 of Graham's motion for preliminary approval) after the Court issues a decision on any motion for leave to conduct discovery.[14] (Doc. 51 at 16). Should Caracci determine that a motion for leave to conduct discovery is no longer necessary, Caracci shall so inform the Court on or before **February 14, 2020**.[15]

## IV. CONCLUSION

Based upon the foregoing, Graham's Motion for Preliminary Approval of Derivative Litigation Settlement (Doc. 51) is **GRANTED** as follows:

1. The Settlement Agreement (Doc. 51-1 at Ex. 1) is **PRELIMINARILY APPROVED**, subject to further consideration at the settlement hearing;

2. The Proposed Notice (Doc. 55-1 at Ex. B) is **APPROVED** as to its form and substance, however, the Proposed Notice shall not yet issue;

3. The parties are **DIRECTED** to file any motions/memoranda regarding leave to conduct discovery in accordance with the schedule established in Section III.C *supra*; and

4. The Court will establish by way of a further order a schedule, regarding the issuance of the Proposed Notice, the date/time of the settlement hearing, and the occurrence of all other related deadlines, after it issues a decision on any motion/memoranda regarding leave to conduct discovery filed in accordance with the schedule established in Section III.C *supra*.

---

[14] In establishing this schedule, the Court can address Caracci's stated concerns about Graham's proposed schedule if and as appropriate. (Doc. 55 at 18–19; *see also* Doc. 51 at 16).

[15] The Court will note that Caracci is entitled to file a motion seeking pre-hearing discovery. And Caracci is entitled to file an objection to the final settlement agreement. However, Caracci is not entitled to pursue a frivolous end. The Court understands that Caracci's counsel is angry about the way the other parties settled this case. But, if anger—rather than fact—is the driving force behind any further allegations of "collusion," the Court will be extraordinarily displeased. *N.B.* Fed. R. Civ. P. 11(c)(3).

**IT IS SO ORDERED.**

Date:  1/24/2020

Timothy S. Black
United States District Judge