**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| IN RE THE WENDY'S COMPANY SHAREHOLDER DERIVATIVE ACTION | )  CASE NO: 1:16-cv-01153 )  Judge Timothy S. Black ) ) |

**DECLARATION OF STUART J. GUBER IN FURTHER SUPPORT OF PLAINTIFF
JAMES GRAHAM'S MOTION FOR FINAL APPROVAL OF DERIVATIVE
LITIGATION SETTLEMENT AND AWARD OF ATTORNEYS' FEES
AND REIMBURSEMENT OF EXPENSES**

I, STUART J. GUBER, declare as follows:

1.    I am a partner of the law firm of Evangelista Worley, LLC and former partner of Faruqi & Faruqi, LLP ("Faruqi & Faruqi"), counsel for plaintiff James Graham ("Plaintiff" or "Graham") in the above-captioned shareholder derivative action (the "Action"), and one of the law firms appointed by the Court to serve as Co-Lead Counsel in the Action, along with Strauss Troy Co., LPA ("Strauss Troy").  I am a member in good standing of the Georgia State Bar and of the Commonwealth of Pennsylvania, and my motion for admission *pro hac vice* to the U.S. District Court for the Southern District of Ohio to appear in this Action is currently pending before this Court.[1]

2.    I submit this Declaration in further support of Plaintiff James Graham's Motion for Final Approval of Derivative Litigation Settlement and Award of Attorneys' Fees and Reimbursement of Expenses (the "Motion") which seeks the entry of an order granting final approval of the settlement (the "Settlement") embodied in the February 14, 2019 Stipulation and

---

[1] I am planning to refile my *pro hac vice* motion by August 19, 2021.

Agreement of Settlement (the "Agreement" or "Settlement" or "Stipulation").[2]  I have personal knowledge of the matters stated herein based on my active participation in all material aspects of the initiation, prosecution, and Settlement of the Action.  If called upon, I could and would competently testify that the following facts are true and correct.

## I.    PRELIMINARY STATEMENT

3.    As detailed herein, the Settlement, as outlined in the Stipulation, provides that in consideration of the full settlement and release of all of Shareholders' Released Claims against Defendants' Released Persons, The Wendy's Company ("Wendy's" or the "Company") agrees to adopt and/or maintain certain corporate governance measures with respect to its Company-owned U.S. restaurants and systems, within thirty (30) days of issuance of the Order and Final Judgment in this Action, as referenced in ¶ 2.1 of the Stipulation.

4.    The Court has preliminarily found that the Settlement is "sufficiently fair, from both (A) a substantive standpoint and (B) a procedural standpoint".  Doc. 72 at 11.  This Declaration is submitted in further support of Plaintiff's request that the Court grant final approval of the Settlement and dismiss the Action, with prejudice, in its entirety.

5.    Faruqi & Faruqi has significant experience litigating complex stockholder actions. *See* Firm Résumé, attached as Exhibit A to the Declaration of Nina M. Varindani on Behalf of Faruqi & Faruqi, LLP in Support of Award of Attorneys' Fees and Reimbursement of Expenses attached hereto as Exhibit 1.  Based on my own experience in this area of the law, I am familiar with the legal issues associated with initiating, prosecuting, and given the right circumstances, settling shareholder derivative actions.  I believe the Settlement provides Wendy's and Current

[2] Unless otherwise defined herein, all capitalized terms are defined in the Stipulation and Agreement of Settlement ("Stipulation" or "Stip.") dated February 14, 2019, (Doc. 51-1, Ex. 1). Citations, internal quotation marks, and footnotes are omitted.

2

Wendy's Stockholders with substantial benefits and is in all aspects "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

6.      This declaration sets forth: (a) the nature of the claims asserted in the Action; (b) the procedural history of the proceedings to date; (c) the legal services provided by Plaintiff's Counsel and Counsel for Michael Coahn ("Coahn," and together with Graham, the "Shareholders") ("Plaintiff's Counsel and Coahn's Counsel are hereinafter collectively referred to as "Shareholders' Counsel"), who made a shareholder demand (the "Demand") on Wendy's Board of Directors (the "Board"); (d) the negotiations leading to the Settlement; (e) the reasons why the Settlement is fair, reasonable, and adequate, and in the best interests of Wendy's and Current Wendy's Stockholders; and (f) the reasons the agreed-upon Fee Award and request for an Incentive Award should be approved.

7.      Prior to, during, and at all times during the Action and Demand, the Shareholders and Shareholders' Counsel vigorously and diligently pursued the best interests of Wendy's and Current Wendy's Stockholders through, *inter alia*: (i) inspecting, analyzing, and reviewing Wendy's public filings with the Securities and Exchange Commission ("SEC"), press releases, announcements, transcripts of investor conference calls, news articles and analyst reports; (ii) reviewing and analyzing the complaints, proceedings, and relevant documents associated with other lawsuits filed relating to the Company;[3] (iii) drafting the *Graham* Complaint which initiated

---

[3] The other lawsuits include a financial institutions class action filed in the U.S. District Court for the Western District of Pennsylvania styled as *First Choice Federal Credit Union, et al. v. Wendy's Company, et al.*, Case No.: 2:16-cv-00506-MPK (W.D. Pa.); a consumer class action filed in the U.S. District Court for the Middle District of Florida styled as *Jackson, et al., v. Wendy's International LLC*, Case No.: 6:16-cv-00210-Orl-40DAB (M.D. Fla.); and an action premised upon data security issues by one of the Company's largest franchisees filed in the Ohio Court of Common Pleas styled as *Wendy's International, LLC v. DavCoRestaurants LLC, et al.*, No. 14-cv-013382 (Ohio Ct. Comm. Pl. Franklin Cty.).

the Action; (iv) drafting Coahn's Demand; (v) researching the applicable law with respect to the claims asserted in the Action and the potential defenses thereto; (vi) researching corporate governance issues; (vii) retaining Mr. Robert E. Anderson, Jr. of Navigant ("Anderson" or "Mr. Anderson") as a consulting expert; (viii) attending and participating in the Information Session with Mr. Anderson; (ix) preparing and submitting a detailed joint settlement demand; (x) preparing and submitting a detailed mediation statement; (xi) attending and participating in the Mediation; (xii) reviewing thousands of pages of non-public materials provided through confidential mediation and settlement discussions; (xiii) participating in extensive settlement discussions with Ralph B. Levy, Esq. ("Mr. Levy" or the "Mediator") and counsel for Defendants; (xiv) drafting the Consolidated Complaint; and (xv) researching and drafting motions and opposition papers to motions filed in the Action by Defendants and plaintiff Thomas Caracci ("Caracci").

8.     As demonstrated herein and as set forth in the Stipulation and the Memorandum of Law in Support of the Motion filed concurrently herewith (the "FA Brief"), the Parties[4] have engaged in extensive settlement negotiations, including an Information Session and formal Mediation, ultimately culminating in the agreed-upon Settlement.  The vigorous, arm's-length settlement negotiations that led to the Settlement included: (i) attendance and participation at an Information Session and the Mediation (ii) Shareholders' Counsel submitting a joint, written settlement demand, which was drafted with the assistance of Mr. Anderson, Plaintiff Graham's

---

[4] As defined in the Stipulation, the term "Parties" is inclusive of each of the Shareholders (Graham and Coahn, on behalf of themselves and derivatively on behalf of Wendy's), each of the Individual Defendants, and Nominal Defendant Wendy's.  The definition does not include Caracci.  As addressed in the FA Brief as well as in Plaintiff's Supplemental Memorandum in Further Support of his Motion to Appoint Strauss Troy and Faruqi & Faruqi, LLP as Lead Counsel (Doc. 40) ("LC Suppl. Mem."), Shareholders' Counsel proposed an arrangement to counsel for Caracci whereby each of the shareholders' counsel would coordinate efforts and work together as equals in the settlement process.  Caracci's counsel declined.

cybersecurity expert; (iii) attendance and participation at meetings and telephonic conferences amongst counsel for the Parties; and (iv) the exchange of draft terms of settlement.

9.      Settlement negotiations were conducted at arm's-length by fully informed, sophisticated counsel possessing adequate knowledge of the given strengths and weaknesses of each claim and defense.

10.      As set forth in the FA Brief and discussed below, Shareholders' Counsel also seek, pursuant to the Stipulation, final approval of the agreed-to Fee Award in the amount of $950,000, and further seek final approval for an Incentive Award to be paid to Shareholders in an amount of $2,500, each.

11.      I respectfully submit that the agreed-to Fee Award is fair and reasonable given the substantial benefits conferred upon Wendy's and Current Wendy's Stockholders as a result of the commencement, prosecution, and Settlement of the Action, the risks faced by Shareholders' Counsel in initiating and prosecuting the Action, pursuit of the Demand, the substantial efforts of Shareholders' Counsel through investigating claims, and vigorously advocating during the Mediation and settlement process, as well as, the contingent nature of the representation and fee awards in similar cases which have produced similar relief.  Further, the requested Incentive Award is fair and reasonable given the participation of the Shareholders in deriving substantial benefits for Wendy's and all Current Wendy's Stockholders.

12.      Subsequent to the posting and publication of the Court-approved Notices to Current Wendy's Stockholders, although the deadline to object to the Settlement is August 12, 2021, I am unaware of any objection to any aspect of the Settlement to date, except for the anticipated forthcoming objection by Caracci, which Plaintiff will address in reply papers to be filed with the

Court by August 26, 2021. The lack of significant objections further supports the fairness, reasonableness, and adequacy of the Settlement.

## II.     BACKGROUND

### a.     Factual Background

13.     According to the Company's public filings, Wendy's is one of the world's largest quick-service restaurant company in the hamburger sandwich segment.  Wendy's primarily engages in the operation, development, and franchising a system of distinctive quick-service restaurants serving high quality food.  At the time the *Graham* Complaint was filed, Wendy's maintained over 6,000 establishments in North America, the majority of which were franchisee owned, with approximately 337 company-owned restaurants.

14.     In January 2016, Wendy's announced that it was investigating reports of suspicious activity involving payment cards used at some of its restaurants (the "Data Breach").  Shortly thereafter, the Company disclosed that certain franchisee-owned restaurant locations were found by cybersecurity experts to have malware on their systems, and that the Company was continuing to work closely with cybersecurity experts and law enforcement officials to investigate the matter.

15.     In May 2016, the Company disclosed that: "Based on the preliminary findings of the investigation and other information, the Company believes that malware, installed through the use of compromised third-party vendor credentials, affected one particular point of sale ['POS'] system at fewer than 300 of approximately 5,500 franchised North America Wendy's restaurants, starting in the fall of 2015."  The Company further disclosed that the malware had been disabled and eradicated in affected restaurants, but that the investigation was ongoing.

16.     The Company subsequently announced that, in its continued investigation, the Company discovered a variant of the malware on a different POS system at additional franchisee-

owned restaurants. The announcement stated: "Many franchisees and operators throughout the retail and restaurant industries contract with third-party service providers to maintain and support their POS systems. The Company believes this series of cybersecurity attacks resulted from certain service providers' remote access credentials being compromised, allowing access to the POS system in certain franchise restaurants serviced by those providers." The Company further disclosed that no Company-operated restaurants were impacted by this activity.

### b. Procedural Background

17. On December 16, 2016, Plaintiff filed a verified shareholder derivative complaint captioned *Graham v. Peltz, et al.*, 1:16-cv-01153-TSB (the "*Graham* Complaint") in the U.S. District Court for the Southern District of Ohio. Doc. 1. The *Graham* Complaint is based on the Data Breach, related events and the alleged breach of fiduciary duties, waste of corporate assets, unjust enrichment, and gross mismanagement by the Individual Defendants in connection with the Company's cyber security and risks.

18. On March 10, 2017, Defendants filed a motion to dismiss the *Graham* Complaint for failure to state a claim under Rule 12(b)(6) and for failure to make a pre-suit demand on the Company's board or to plead particularized facts to show that such a demand would be futile, as required by Rule 23.1 and Delaware Court of Chancery Rule 23.1. Doc. 9.

19. After Defendants filed the Motion to Dismiss Graham's Complaint, Caracci, another Wendy's shareholder, filed a second shareholder derivative complaint, captioned *Caracci v. Brolick, et al.*, 1:17-cv-00192-TSB (the "*Caracci* Complaint") based on the Data Breach.

20. On March 22, 2017, counsel for Coahn, another Wendy's shareholder, sent the Demand to the Board demanding that the Board investigate potential breaches of fiduciary duty related to the Data Breach.

21.     The Demand alleged, among other things, that management breached their fiduciary duties of loyalty and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures with respect to data security for the Company and its franchisees; (ii) failing to exercise their oversight duties by allegedly not monitoring the Company and its franchisees' compliance with federal and state laws; and (iii) failing to cause the Company to make full and fair disclosures concerning the effectiveness of the Company's policies and procedures with respect to data security and the scope and impact of the Data Breach.  Coahn therefore demanded that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into management's alleged violations of Delaware and/or federal law and (ii) commence a civil action against each named member of management to recover for the Company the alleged damages to the Company as a result of the purported breaches of fiduciary duty.

22.     Counsel for the Board, Cleary Gottlieb Steen & Hamilton LLP, sent a letter in response to the Demand to Coahn's counsel on May 24, 2017 (the "Cleary Letter").  The Cleary Letter informed Coahn's counsel that, because of the issues being litigated in the Action, the Board would defer acting upon the Demand pending a ruling on the sufficiency of the pleadings in the Action, and that the Board would monitor developments and consider the Demand at a later time.

23.     Unable to come to an agreement with respect to leadership of the Action, on May 17 and 18, 2017, Graham and Caracci each filed a motion to consolidate the cases and to appoint their respective counsel as lead.  Docs. 17 and 18.  On June 9, 2017, while the competing leadership motions and Defendants' motion to dismiss were still pending, Caracci, Graham and Defendants filed a joint motion for an order to suspend deadlines and enter a schedule for the consolidated action.  Doc. 22.  On June 12, 2017, the Court issued an order granting the motion to suspend the

deadlines in the *Caracci* Action and the Action, entered a schedule for the consolidated action, but did not rule on the competing leadership motions.  Doc. 23.

24.     As more fully discussed below in Section c. "Settlement", while the competing leadership motions were pending with the Court, counsel for the parties began discussing and exploring a possible resolution of the Action that would be in the best interest and for the benefit of Wendy's and Current Wendy's Stockholders.

25.     On March 30, 2018, the Court entered a Notation Order consolidating the *Graham* and *Caracci* Actions, but withheld ruling upon the competing leadership motions.

26.     On April 24, 2018, counsel for the Parties appeared in Court for a status conference. At the conference, counsel for Graham advised the Court that Graham and Coahn had reached a settlement in principle with Defendants and were in the process of preparing preliminary approval papers.  The Court also reactivated Graham and Caracci's leadership motions and permitted plaintiffs Graham and Caracci to submit additional memoranda in support of their motions.

27.     On May 6, 2018, Graham filed a Motion for Preliminary Approval of the Derivative Litigation Settlement ("Preliminary Approval Motion").  Doc. 41.  On May 25, 2018, Caracci filed a motion for leave to file under seal his opposition to the Preliminary Approval Motion, relief from the mediation privilege and an extension of time to file his opposition to the Preliminary Approval Motion.  Doc. 42.

28.     On December 17, 2018, this Court issued an order granting Plaintiff Graham's Motion to Appoint Lead Counsel, denying Caracci's Motion to Appoint Lead Counsel, and ordering Plaintiff Graham to file a consolidated complaint.  Doc. 49.  The order also denied Defendants' motion to dismiss as moot, denied the Preliminary Approval Motion as premature pending the filing of a consolidated complaint, and denied Caracci's motion to file under seal and

for relief from the mediation privilege as moot. *Id.* The Court also directed Caracci to submit his opposition to the Court for an in-camera review within twenty-one days of Plaintiff Graham filing an amended motion for preliminary settlement approval. *Id.*

29.    On January 31, 2019, Graham filed a Consolidated Verified Shareholder Derivative Complaint (the "Consolidated Complaint"), and on February 14, 2019, Graham filed a Motion for Preliminary Approval of Derivative Litigation Settlement (the "Amended Preliminary Approval Motion"). Docs. 50 and 51.

30.    On March 5, 2019, Caracci filed his opposition to Graham's Amended Preliminary Approval Motion under seal, arguing that the Settlement should not be approved because it was the product of collusion. Doc. 52.

31.    Three days later, on March 8, 2019, Defendants moved to lift the seal on Caracci's motion and certain exhibits, which the Court granted on April 15, 2019. Doc. 53 and 62. On April 12, 2019, Plaintiff Graham filed a reply in support of his Amended Preliminary Approval Motion and a response in opposition to Caracci's opposition under seal. That same day, Defendants also filed their brief in response to Caracci's opposition to the Amended Preliminary Approval Motion under seal.

32.    On January 24, 2020, the Court issued an order granting the Amended Preliminary Approval Motion (the "Preliminary Approval Order") and approving the substance of the Proposed Notice to Wendy's shareholders, rejecting Caracci's arguments that the Settlement was the product of "collusion" and establishing a briefing schedule for any motion for leave to conduct discovery that Caracci may file. Doc. 72.

33.    On February 13, 2020, Caracci filed a Motion for Leave to Conduct Discovery (the "Caracci Discovery Motion"), which Plaintiff and Defendants opposed on March 6, 2020. Docs.

73, 76 and 77. On May 19, 2021, the Court issued an order granting in part and denying in large part the Caracci Discovery Motion and directing Plaintiff Graham to file with the Court (1) an amended Proposed Notice to account for the forthcoming virtual settlement hearing and (2) a Proposed Order detailing the schedule of events in the Action. Doc. 84.

34.     On May 26, 2021, Graham filed amended notices in accordance with the Court's order and on June 3, 2021, the Court entered an Order Scheduling Settlement Fairness Hearing ("Settlement Hearing") and Setting Dates Related to the Settlement Hearing ("Scheduling Order"), finding the amended Notice ("Amended Notice") and amended Summary Notice ("Amended Summary Notice," and together with the Amended Notice, the "Amended Notices") sufficient, and scheduling the Settlement Hearing for September 2, 2021. Docs. 85 and 86. The Scheduling Order also provided that any objections to the Settlement must be filed with the Court and served upon Defendants' Counsel and Plaintiff's Counsel at least twenty-one (21) calendar days prior to the Settlement Hearing; thus, any Persons making such objection(s) have until August 12, 2021 to comment or object to any portion of the Settlement.[5] Doc. 86.

35.     On June 17, 2021, Defendants and Graham provided notice to the Court that they had complied with the Court's May 19, 2021 Order by responding to certain of Caracci's discovery requests. Doc. 88.

36.     On July 16, 2021, Caracci filed his second Motion for Leave to File Under Seal his Objection to the Proposed Settlement and for Relief from the Mediation Privilege, which Graham and Defendants opposed on July 23, 2021. Docs. 89, 90 and 91. On July 27, 2021, Caracci filed his reply brief in further support of his motion. Doc. 92. On July 30, 2021, the Court entered an

_____

[5] Plaintiff will address any objections that may be filed with the Court and/or received by Plaintiff's Counsel by the objection deadline in the reply papers to be filed with the Court by August 26, 2021.

Order denying Caracci relief from the mediation privilege, but temporarily granted Caracci leave to file his objection to the Settlement under seal. Doc. 93.

### c. The Settlement

37.     Faruqi & Faruqi retained Mr. Anderson, a renowned cybersecurity expert and former national security executive with the Federal Bureau of Investigation ("FBI") who also was an integral part of the *Home Depot* Action[6] and resulting settlement, for the purpose of assisting Graham and the other parties in navigating the complex and novel issues involved in the Action. Anderson also provided Shareholders' Counsel with critical insight enabling them to devise crucial and effective corporate governance reforms intended to enhance information technology and cybersecurity policies and procedures at Wendy's.

38.     On July 31, 2017, Shareholders' Counsel and counsel for Caracci attended the Information Session with counsel for Wendy's and certain Wendy's employees in New York City. Also in attendance at the Information Session were Anderson and a cybersecurity expert retained by Caracci.

39.     The Information Session was conducted under the mediation privilege and supervised by an experienced mediator, Jed D. Melnick, Esq. ("Mr. Melnick") of JAMS. During

---

[6] The *Home Depot* Action (*In re The Home Depot, Inc. Shareholder Derivative Litigation*, Case No. 1:15-cv-02999-TWT (N.D. Ga. Aug 25, 2015)), was a shareholder derivative lawsuit in which Faruqi & Faruqi served as co-lead counsel for plaintiffs and Alston & Bird, LLP served as defense counsel. Similar to this Action, the *Home Depot* Action arose from a highly publicized data breach. The parties to the *Home Depot* Action ultimately arrived at a settlement while the Northern District of Georgia's decision granting defendants' motion to dismiss was on appeal with the U.S. Circuit Court of Appeals for the 11th Circuit. Faruqi & Faruqi's experience in the *Home Depot* Action allowed our firm to formulate an effective strategy in this Action. The settlement in the *Home Depot* Action received preliminary approval on July 14, 2017 and provided for a series of corporate governance reforms that were specifically tailored to address the company's cybersecurity issues. The settlement of the *Home Depot* Action received final approval on October 2, 2017.

the Information Session, Wendy's additionally provided to Graham, Caracci and Coahn's counsel certain confidential, non-public information related to the allegations in the Derivative Matters[7] and Defendants' defenses.

40.     Although the Information Session did not result in a settlement, over the next few weeks, the parties continued engaging in settlement discussions in the hopes of achieving a global resolution of the Derivative Matters.   Specifically, counsel for Coahn contacted counsel for Graham and Caracci and proposed an arrangement whereby their respective law firms would coordinate and work together as equals in connection with any efforts to settle the case on terms beneficial to the Company.   Although Graham's counsel readily agreed, Caracci's counsel rejected the offer to share the case equally and coordinate their efforts.[8]

41.     On December 6, 2017, Shareholders' Counsel submitted a joint settlement demand to counsel for Defendants, which was drafted with the assistance of Mr. Anderson.

42.     On February 12, 2018, after drafting and submitting confidential mediation statements, Shareholders' Counsel and counsel for Defendants attended a full day in-person mediation under the supervision of Mr. Levy in Atlanta, Georgia (the "Mediation").   Again, despite being invited to the Mediation, Caracci refused to attend.

43.     Although the Parties did not reach a final agreement by the conclusion of the Mediation, the respective mediation statements and the dialogue during the Mediation were critical to, and served as the springboard for, subsequent productive conversations between counsel for the Parties with the continued oversight and assistance of the Mediator, which ultimately led to the Settlement.

---

[7] The term "Derivative Matters" refers to the Action, the *Caracci* Action and the Demand.
[8] *See* LC Suppl. Mem. 2.

44. In the weeks following the Mediation, the Parties continued their discussions and, eventually, reached an agreement in principle regarding the material substantive terms of the Settlement.

45. After agreeing upon the substantive terms of Settlement, Shareholders' Counsel and Defendants' Counsel, with the assistance of the Mediator, commenced negotiations at arm's-length regarding the attorneys' fees and expenses to be paid to Shareholders' Counsel. Ultimately, the Mediator issued a "Mediator's Proposal" for a fee in the amount of nine hundred fifty thousand dollars ($950,000) to be paid to Shareholders' Counsel by Wendy's D&O insurance carrier(s) based on the substantial benefits conferred on Wendy's and Current Wendy's Stockholders by the Settlement, subject to the approval of the Court. All Parties accepted the Mediator's Proposal.

46. The Stipulation, together with the exhibits thereto, reflects the final and binding agreement between the Parties.

47. On April 24, 2018, counsel for the Shareholders and Defendants appeared before the Court for a status conference. At the conference, counsel for Graham advised the Court that Graham and Coahn had reached a settlement in principle with Defendants and were in the process of preparing preliminary approval papers. On May 6, 2018, Graham filed the Preliminary Approval Motion. Doc. 41.

48. In light of the pending leadership motions and the fact that a consolidated complaint had not yet been filed, on December 17, 2018, the Court denied the Preliminary Approval Motion as premature and directed Graham to file an amended motion for preliminary settlement approval after designating an operative complaint or filing a consolidated complaint. Doc. 49. Subsequently, Plaintiff Graham filed the Consolidated Complaint and, on February 14, 2019, filed the Amended Preliminary Approval Motion. Docs. 50, 51.

49.     On January 24, 2020, the Court entered the Preliminary Approval Order.  Doc. 72. Subsequently, on June 3, 2021, the Court entered the Scheduling Order finding the Amended Notices sufficient and scheduling the Settlement Hearing for September 2, 2021.  Doc. 86.

**d.     Notice**

50.     Pursuant to the Preliminary Approval Order, the Court determined that the form and manner of the proposed notice submitted by Graham complied, in both form and substance, with the Sixth Circuit standard regarding the provision of notice.  Although the Court concluded that the proposed notice provided Wendy's shareholders with enough information to permit them to make a rational decision about whether to intervene in the settlement-approval process, the Court delayed the issuance of the proposed notice pending the Court's ruling on Caracci's Discovery Motion.

51.     The Scheduling Order provided that, within thirty (30) calendar days after entry of the Scheduling Order, Wendy's shall: (a) post a copy of the Stipulation and Amended Notice on the Investor Relations portion of the Wendy's website; (b) cause a Current Report on Form 8-K to be filed with the SEC that attaches the contents of the Amended Summary Notice and provides a link in the 8-K to the Stipulation and Amended Notice that shall be posted on the Investor Relations portion of Wendy's website; and (c) cause a copy of the Summary Notice to be published one time in *IBD Digital* version.

52.     Pursuant to the Scheduling Order, Wendy's has filed a declaration attesting to compliance with the notice requirements concerning posting of the Amended Notice and publication of the Amended Summary Notice.  Doc. 96. Although the deadline to file objections to the Settlement is August 12, 2021, to date, there have been no objections beyond those raised by Caracci.

## III. TERMS OF THE SETTLEMENT

53.     The Settlement confers substantial benefits upon Wendy's and all Current Wendy's Stockholders.  In consideration of the full settlement and release of all of Shareholders' Released Claims against Defendants' Released Persons, Wendy's, subject to Board approval, agrees to adopt and/or maintain the following measures with respect to its Company-owned U.S. restaurants and systems, within thirty (30) days of issuance of the Order and Final Judgment:

      a.    The Board will maintain a Technology Committee with oversight responsibilities relating to matters of information technology and cybersecurity;

      b.    The Technology Committee will be governed by a Charter, which will include in relevant part that the Technology Committee shall oversee, among other things, cybersecurity matters;

      c.    The Technology Committee Charter will be approved no later than fifteen (15) days prior to a hearing on any motion for final approval of the settlement;

      d.    Management will report to the Technology Committee on any material findings arising out of the annual Qualified Security Assessor ("QSA") reviews of the Company as a merchant of record for all Company-owned stores and as a service provider to franchisees, to the extent such QSA reviews are required by Payment Card Industry Data Security Standards ("PCI DSS");

e.      The Technology Committee will retain the right to meet with the officer with oversight of the Company's cybersecurity program in executive session as the Committee deems necessary and appropriate;

f.      On at least an annual basis, and more frequently if requested by the Technology Committee, the Company's Management will report to the Technology Committee regarding the Company's cybersecurity program and material cybersecurity risks;

g.      The Board or a Committee thereof will continue to be authorized to retain its own IT, data and security experts and consultants to assist in its cybersecurity oversight function, as it deems necessary;

h.      The Company will either (a) continue to maintain Wendy's Technology, LLC ("WeTech") or a similar entity, which will offer to Wendy's franchisees certain Foundational Security Services, as may be amended from time to time in the WeTech Products and Services Agreement or any similar document or (b) require franchisees to use a Company-approved third-party vendor(s) for similar services;

i.      The Company will continue to maintain the Wendy's Technology Advisory Council ("WTAC");

j.      The officer with oversight of the Company's cybersecurity program, or someone who reports directly to him or her, will continue to serve as the Wendy's Member, which will be the Chair of the WTAC;

k.      The Company will continue to maintain and update as needed the information security standards in its Franchisee Operations Manual or a

similar document that is distributed to franchisees, and the manual or other similar document will continue to include information regarding the franchisees' obligations to comply with PCI DSS;

l.    The Company will continue to maintain and periodically re-evaluate an Incident Response Plan or a similar document to address potential significant cybersecurity incidents;

m.    The Company will continue to maintain an Information Security Incident Management Plan or similar document;

n.    The Company will continue to maintain and periodically re-evaluate its Information Security Policy;

o.    The Company's Enterprise Risk Management team, which includes members of the Company's legal, risk management, and information security departments, will continue to meet on a regular basis, and will continue to discuss and evaluate potential risks to the Company, which may include cyber risks;

p.    Management will continue to maintain monitoring for indicators of compromise on the Company's computer network endpoints, to the extent required by PCI DSS;

q.    Management will continue to ensure that the Company's network topology is reasonably segmented;

r.    Management will continue to deploy anti-virus protections on all Company-owned store based IT assets, to the extent required by PCI DSS;

s.     Management will continue to conduct regular external and internal penetration testing; and

t.     The Company will continue to conduct IT table-top exercises periodically.

54.     The Measures will be materially maintained for at least three (3) years following the issuance of the Order and Final Judgment, subject to any of the following: (a) a determination by a majority of the non-management Directors that the Measure is no longer in the best interest of the Company, including, but not limited to, due to circumstances making the Measure no longer applicable, feasible, or available on commercially reasonable terms; (b) a determination by the officer designated as the head of the Company's cybersecurity program and approved by a majority of the members of the Board's Technology Committee that the Measure is no longer in the best interest of the Company, including, but not limited to, due to circumstances making the Measure no longer applicable, feasible, or available on commercially reasonable terms; or (c) modifications which the Company reasonably believes are required by applicable law or regulation; provided, however, that nothing in this Stipulation applies to the Technology Committee Charter with respect to non-cybersecurity matters.

## IV.     FACTORS TO BE CONSIDERED IN SUPPORT OF THE SETTLEMENT

### a.     The Settlement Provides Significant Benefits to Wendy's and the Company's Current Shareholders

55.     The Settlement provides significant benefits to Wendy's and Current Wendy's Stockholders because, through the Settlement, Wendy's will implement and/or maintain Measures designed to further improve the Company's overall corporate governance related to oversight of cybersecurity risks. *See* Stip. ¶ 2.1. For example, as more fully discussed in the Stipulation and Memorandum of Law in support of the Motion, the Board will maintain a Technology Committee to oversee relevant information technology and cybersecurity matters; the Technology Committee

will receive reports regarding any material findings arising out of the annual QSA reviews of the Company; at least annually, Management will report to the Technology Committee regarding Wendy's cybersecurity program and material cybersecurity risks; and Wendy's will continue to maintain the WTAC.  *Id.*

56.     The agreed-upon Measures outlined in the Stipulation are at least as comprehensive and valuable as any judgment that could be achieved at trial; however, final approval of the Settlement will allow Wendy's and Current Wendy's Stockholders to realize the value of these Measures certainly and immediately.

**b.     The Settlement is Not the Product of Fraud or Collusion**

57.     The Settlement was the result of months of vigorous arm's-length negotiations between Shareholders' Counsel and Defendants' Counsel with the critical assistance of Messrs. Melnick and Levy, both highly experienced mediators.

58.     Shareholders' Counsel also received the critical assistance of Anderson, whose experience allowed Shareholders' Counsel to negotiate and evaluate proposed settlement terms in a fully informed manner.

59.     Shareholders' Counsel entered into the Stipulation only after thoroughly investigating the claims, reviewing public and confidential documents, vigorously litigating the Action and pursuing the Demand, carefully evaluating the opinions of experts, discussing the Data Breach, Wendy's response thereto, and existing corporate governance policies at the Information Session and the subsequent Mediation, and continuing to negotiate the substantive terms of the settlement thereafter.

60.     Shareholders' Counsel was able to draw upon their significant experience in considering the Settlement as a whole.  Shareholders' Counsel includes nationally recognized

leaders in shareholder litigation with decades of experience in prosecuting stockholder representative litigation and extensive track records of substantial recoveries for corporations and their stockholders.

61. Similarly, Defendants were vigorously represented by Alston & Bird, LLP, a preeminent corporate defense firm with vast experience in shareholder derivative litigation. Defendants' Counsel's reputation provides additional assurance that the Settlement is the result not of fraud or collusion, but the product of vigorous litigation.

62. The involvement of highly experienced, well respected counsel, on both sides of the Action further supports the conclusion that the resulting Settlement is in the best interest of the Company and Current Wendy's Stockholders, and that the Settlement is fair, reasonable, and adequate.

63. Moreover, further supporting the conclusion that there was no fraud or collusion present, the Shareholders' Counsel and Defendants' Counsel did not negotiate the Fee Award until after they had reached an understanding as to the substantive terms of the Settlement. Specifically, after negotiation of the principal terms of the Settlement, Shareholders' Counsel and Wendy's commenced negotiations at arm's-length regarding the amount of attorneys' fees and expenses to be paid to Shareholders' Counsel, with the substantial assistance and oversight of the Mediator.

64. Finally, the strongest evidence in support of the conclusion that the Parties did not collude when negotiating the Settlement and Fee Award is in the Preliminary Approval Order, in which the Court rejected Caracci's arguments that the Settlement was the product of collusion. Doc. 72. Indeed, the Court's decision was based upon briefing by all of the parties, filed under seal, which contained confidential information discussing the settlement process in detail. As such, the Court should presume that the Settlement is fair, reasonable, and adequate.

### c.    The Complexity, Expense and Likely Duration of the Litigation

65.    Shareholder derivative litigation is notoriously complex, carries significant expense, and presents the risk of continued, protracted litigation.  In further assessing the fairness, reasonableness, and adequacy of a shareholder derivative settlement, this Court can and should consider the overall benefit to the Company garnered as a result of the Settlement as compared to the complexity, expense and likely duration of the litigation.

66.    The Measures outlined in the Stipulation were vigorously negotiated, provide a substantial benefit, and were designed in consideration of the events that gave rise to the Action in the first place.  *See* Stip. ¶ 2.1.  Additionally, by way of the Settlement, the Company and Current Wendy's Stockholders will certainly and immediately reap the substantial benefits of the Measures without the risks and complications posed by further protracted litigation.  Moreover, the implementation and maintenance of the Measures will continue to significantly improve the rigor and effectiveness of Board supervision of the Company's cybersecurity, overall.

67.    Plaintiff believed and continues to believe that the claims alleged in the Action are meritorious; however, he and Shareholders' Counsel also recognized that, absent the Settlement, continued litigation of the Action would undoubtedly result in further complexity and cost, all the while risking the known, material benefits contained in the Measures for the hope and risk of achieving (at least) the same at the conclusion of trial.

68.    Had litigation of the Action continued, there was a great risk that Plaintiff may have been unsuccessful with respect to Defendants' anticipated pre-trial motions designed to curtail or even eliminate Plaintiff's claims.  Such motions would certainly have included, among other things, motions to dismiss for failing to satisfy the demand requirements pursuant to Fed. R. Civ. P. 23.1 and Delaware law, which requires a plaintiff to state with particularity either that the

shareholder's demand on the board of directors was wrongfully refused or why making a demand on the board of directors was futile.[9] Although Plaintiff is confident that he would have defeated any such motion, it would be costly and require the parties and the Court to invest significant time.[10]

69. Assuming that Plaintiff's claims survived a motion to dismiss, Plaintiff also faced the risks and expenses inherent in any complex litigation including, among other things, additional dispositive motion practice, other pretrial challenges, battles of the experts, a lengthy trial, and post-trial litigation and appeals.

70. When comparing the complexity, expense, and likely duration of continued litigation, as well as the inherent uncertainty that naturally arises through litigation, the Court should favor final approval of the Settlement which provides valuable, certain benefits to Wendy's and Current Wendy's Stockholders without continued risk of litigation.

**d.     The Amount of Discovery Engaged in by the Parties**

71. When considering approval of a potential settlement, Courts in the 6th Circuit consider the amount of discovery available to the plaintiff to, among other things, verify a plaintiff is fully informed in making the decision to settle. As aforementioned in this Declaration and fully discussed in Plaintiff's papers submitted in support of his Motion, Shareholders' Counsel was fully informed and possessed the knowledge and ability to clearly evaluate the strengths and weakness of the Action. This information, combined with the experience of Shareholders' Counsel,

---

[9] Indeed, such a motion to dismiss the *Graham* Complaint was pending at the time the parties initiated settlement discussions. *See* Doc. 9.
[10] Shareholder Coahn faced a similar risk, that the Board or a subcommittee thereof would investigate his Demand and find that it was not in the best interests of the Company to take any additional action.

permitted Shareholders' Counsel to conclude that entering into the Stipulation and the Settlement was in the best interests of Wendy's and all Current Wendy's Stockholders

72. Prior to initiating the Action through the filing of the *Graham* Complaint, Faruqi & Faruqi engaged in an approximate five-and-a-half-month investigation into Wendy's, the Data Breach, and potential claims.

73. After initiating the Action, Shareholders' Counsel received and reviewed a substantial number of confidential, non-public documents from Wendy's during the Information Session. Additionally, the Shareholders eventually received Section 220 documents that were initially produced to plaintiff Caracci.

74. Further, Shareholders' Counsel was able to derive additional invaluable information regarding Wendy's, the Company's cybersecurity policies, the Data Breach, and Wendy's response to the Data Breach via the Information Session held in 2017. As aforementioned, the Information Session permitted Shareholders' Counsel to interact with Wendy's employees who possessed the knowledge of certain events that were directly relevant to the claims asserted in the Action.

75. Additionally, Faruqi & Faruqi retained the expert assistance of Anderson. Anderson is experienced in information technology and cybersecurity matters and has assisted in shareholder derivative litigation involving data breaches and/or cybersecurity issues in the past, including the *Home Depot* Action. The assistance provided by Anderson allowed Shareholders' Counsel to clearly see the strengths and weaknesses of the Action and aided in the drafting and submission of a detailed settlement demand that targeted specific areas of improvement that would substantially benefit Wendy's and Current Wendy's Stockholders.

76.     While negotiating the terms of the Stipulation, counsel for each party possessed adequate information to clearly and effectively evaluate the needs of their respective clients, and the true party at interest, Wendy's.  The amount of discovery obtained by Shareholders' Counsel weighs in favor of final approval of the Settlement, as Shareholders' Counsel possessed sufficient information to fully evaluate the fairness, reasonableness, and adequacy of the Settlement.

**e.     The Likelihood of Success on the Merits**

77.     As discussed at length in Plaintiff's supporting Motion papers, while Shareholders and Shareholders' Counsel believed and continue to believe that their claims were meritorious, significant risks exist in establishing liability and damages in the Action.

78.     First and foremost, absent the Settlement, Defendants would almost certainly file a motion to dismiss the Consolidated Complaint on the grounds that Plaintiff failed to state a claim upon which relief can be granted and make a demand pursuant to Fed. R. Civ. P. 23.1 and Delaware law.

79.     Overcoming a motion to dismiss premised upon demand futility is one of the most uncertain and difficult challenges facing derivative plaintiffs.  Even if the Action survived a motion to dismiss at this stage, Defendants' Counsel, all nationally recognized litigators, would mount a ferocious defense and it could be expected that numerous pre-trial motions would be filed. Moreover, Defendants have denied and continue to deny any liability or wrongdoing with respect to any and all claims and contentions alleged in the Action.

80.     Even if Plaintiff were to overcome a motion to dismiss and prevail at trial, any judgment entered in Plaintiff's favor could, and almost certainly would, be appealed.

81.     Even though Plaintiff believes that his claims have merit, the unpredictable risks of proceeding with the Action, given all of the circumstances, provided a daunting counterpoint to

25

protracted litigation, especially in light of the valuable corporate governance relief obtained as a result of this Settlement. Thus, there were numerous "legal" and "practical" considerations which led to the conclusion that the Settlement presented the best option for all parties.

       **f.**      **The Opinions of Class Counsel and Class Representatives**

82.     Another factor favoring final approval of the Settlement is the judgment of the Shareholders, Shareholders' Counsel, and the Individual Defendants, who all agree that the Settlement is fair, reasonable, and adequate to the Company and its stockholders. *See* Stip. § III.

83.     As aforementioned, the Settlement was the result of extensive arm's-length negotiations between sophisticated adversaries with significant experience in shareholder derivative litigation and other complex litigation. Shareholders' Counsel strongly believes that the Settlement represents the best possible resolution on behalf of the Company and Current Wendy's Stockholders.

84.     This conclusion by Shareholders' Counsel was based in part on: (i) Shareholders' Counsel's investigation and consultation with their experts; (ii) the substantial benefits of the Settlement when weighed against the risk, delay, expense, and uncertainty of continued litigation of the Action and the Demand; and (c) Shareholder Counsel's past experience in litigating similar complex derivative actions, including data breach cases.

85.     Shareholders' Counsel believe the Company and Defendants also considered these issues before agreeing to the terms of the Stipulation. Moreover, by entering into the Stipulation, Shareholders' Counsel believe that Defendants and Defendants' Counsel recognize the Settlement to be in the best interest of Wendy's and Current Wendy's Stockholders.

86.     The opinion of the Parties, Shareholders' Counsel, and Defendants' Counsel should be given deference by the Court and weighs in favor of final approval of the Settlement.

g.      **The Reaction of Absent Class Members**

87.     As discussed above, the Company has timely issued the Amended Notices approved by the Court to Current Wendy's Stockholders.  Doc. 96.  The Amended Notice contained a detailed description of the history of the Action, the Settlement, and the claims that will be released.  The Amended Notice disclosed the time and location of the Settlement Hearing and advised Current Wendy's Stockholders of the procedures for objecting to the proposed Settlement and/or Fee Award.

88.     Beyond Caracci's objections, which are discussed in Plaintiff's papers filed in support of the Motion, and which have previously been addressed by Plaintiff and the Court on multiple occasions and, assuming Caracci timely files his anticipated forthcoming objection to the Settlement, will be further addressed by Plaintiff in reply papers to be filed with the Court by August 26, 2021, Plaintiff's Counsel is unaware of any objections to the Settlement to date, which is very strong evidence that the Settlement, Fee Award, and Incentive Award are (each, respectively) fair, reasonable, and adequate.

h.      **The Settlement is in the Public Interest**

89.     Another factor that the Court considers in evaluating whether a proposed settlement is fair, adequate, and reasonable is whether the settlement is in the public interest.  Here, the Settlement agreed to by the Parties serves the public interest.

90.     As mentioned throughout, the Measures outlined in the Stipulation are carefully crafted to provide for enhanced corporate governance measures specific to the Company's cybersecurity risks and protocols.

91.     Additionally, absent the Settlement, there is a substantial risk that the proceedings in this case will result in extensive protracted litigation at the direct expenses of significant judicial

resources.  Further, the Measures to be adopted by Wendy's are certain and identifiable, and continued litigation risks the loss of the benefits of the Measures agreed-upon through the Stipulation.

92.    Moreover, the Measures adopted by Wendy's and the Board will serve as a model of good corporate governance for other companies and boards seeking to enhance their own policies and procedures regarding information technology and cybersecurity.

## V.    THE AGREED-UPON FEE AWARD IS FAIR, REASONABLE AND SHOULD BE APPROVED

93.    In addition to seeking final approval of the Settlement, Plaintiff's Counsel is making an application to the Court for approval of the agreed-upon Fee Award in the amount of $950,000 to reimburse Shareholders' Counsel for the time, effort, and expenses incurred during the Action.

94.    The agreed-upon Fee Award is fair and reasonable in light of the substantial benefits conferred upon Wendy's and Current Wendy's Stockholders as a result of the Settlement and should be finally approved.

### a.    The Value of the Benefits Conferred Upon the Company

95.    As mentioned throughout this Declaration, the papers filed in support of the Motion, as well as the Stipulation, the Settlement provides substantial benefits to Wendy's and Wendy's Current Stockholders that will be realized through final approval.  The Measures outlined in the Stipulation will further strengthen the Company and Board's ability to oversee and update Wendy's information technology and cybersecurity for years to come.  *See* Stip. ¶ 2.1.  These Measures are not merely general corporate governance reforms; instead, these Measures are of significant value to the Company.

b.      **Society's Stake in Rewarding Attorneys Who Produce Substantial Results and the Contingent Nature of the Fee**

96.     Shareholders' Counsel achieved the substantial benefits of the Settlement for Wendy's and Current Wendy's Stockholders at significant risk to themselves of recovering no fee. Yet, Shareholders' Counsel dedicated significant time and money to advance the interests of the Company and its stockholders.   Shareholders' Counsel committed the necessary time and resources to bring the Action and the Demand to a successful conclusion.

97.     From the outset, Shareholders' Counsel understood that they were embarking on a complex, expensive, and potential lengthy process while shouldering the risk of potentially never receiving compensation for the investment of time and money the Action and Demand would require.  In undertaking that responsibility, Shareholders' Counsel were obligated to ensure that sufficient attorney resources were dedicated to the prosecution of the Action and the Demand and that funds were available to cover the costs associated with experts, staff compensation, and the considerable out-of-pocket expenses that complex cases like the Action and the Demand can entail.

98.     Contingent litigation firms not only have to pay regular overhead, but also advance the expenses associated with the requisite litigation.  As such, contingent counsel is under a greater financial burden than other firms that receive compensation on a monthly basis.

99.     Additionally, in numerous contingent cases such as this Action, counsel for plaintiffs have received no compensation after expending hundreds or thousands of hours of work. Meaningful settlements in cases such as this occur because defendants and their counsel are aware that the members of the corporate securities bar, such as Shareholders' Counsel, are prepared to engage in protracted litigation if necessary, and go to trial to pursue a resolution on the merits if there is no other appropriate outcome reflecting the merits of the case.

100.    Shareholders' Counsel's ability to achieve the Settlement in the face of the obstacles discussed throughout, including Defendants' motion to dismiss and repeated efforts by Caracci to interfere with the Action and the settlement process, supports the approval of the Fee Award as compensation and reimbursement for achieving a substantial result.

### c.    The Value of the Services on an Hourly Basis

101.    Counsel's efforts in pursuit of the substantial benefits conferred upon Wendy's and Current Wendy's Stockholders spanned nearly five years.   Counsel's efforts included: (1) inspecting, analyzing and reviewing Wendy's public filings with the SEC, press releases, announcements, transcripts of investor conference calls, and news articles; (2) drafting the *Graham* Complaint which initiated the Action; (3) drafting Coahn's Demand; (4) researching the applicable law with respect to the claims asserted in the Action and the potential defenses thereto; (5) researching corporate governance issues; (6) retaining Mr. Anderson as consulting expert; (7) attending the Information Session with Mr. Anderson before Mr. Melnick; (8) preparing and submitting a detailed settlement demand; (9) preparing and submitting a detailed mediation statement; (10) attending and participating in the Mediation; (11) reviewing thousands of pages of non-public materials provided through confidential mediation and settlement discussions; (12) participating in extensive settlement discussions with the Mediator and Defendants' Counsel; and (13) drafting the Consolidated Complaint.  *See* Stip. § II.

102.    Shareholders' Counsel have expended approximately 1,677 hours collectively litigating the Action and the Demand to date for a total lodestar of $1,163,314.25. *See,* Exhibits 1, 3 and 4 attached hereto.  Following is a chart indicating the amount of hours and lodestar for each of Shareholders' Counsel:

| **FIRM** | **HOURS** | **LODESTAR** |
|---|---|---|
| Faruqi & Faruqi, LLP | 1,198.45 | $821,716.25 |
| Strauss Troy Co., LPA | 205.80 | $139,706.75 |
| The Weiser Law Firm, P.C. | 272.75 | $201,891.25 |
| **TOTAL** | 1,677 | $1,163,314.25 |

103.    Shareholders' Counsel's efforts allowed highly skilled and experienced counsel on both sides to effectively evaluate the Action and the Demand, and further enabled Shareholders' Counsel to make well-informed judgments as to how to proceed throughout the Action, Demand, and Settlement.   Further, the $950,000 agreed-upon Fee Award is reasonable in light of the substantial benefits achieved and when compared to the lodestar, Shareholders' Counsel are receiving a negative multiplier of 0.82 of their lodestar.

104.    Shareholders' Counsel also collectively incurred $68,596.99 in expenses in prosecuting the Action and the Demand.  Following is a chart indicating a breakdown of each category of expenses:

| **CATEGORY** | **AMOUNT** |
|---|---|
| Computer & Other Research Fee(s) (Lexis/Westlaw/Bloomberg) | $3,812.89 |
| Courier & Overnight Delivery Services | $142.40 |
| Court Filing/Service Fee(s) | $1,440.00 |
| Expert Fees | $37,347.56 |
| Mediation Fees | $21,737.15 |
| Postage | $429.13 |
| Reproduction (Internal) | $543.60 |
| Telephone/Fax | $121.30 |

| Travel Expenses | $3,022.96 |
|---|---|
| **TOTAL** | $68,596.99 |

105.     Shareholder derivative settlements comprised of therapeutic relief and governance benefits often produce fees far in excess of the $950,000 sought here.  These cases include, among others: *City of Plantation Police Officers' Emps.' Ret. Sys. v. Jeffries*, No. 2:14-cv-1380, 2014 WL 7404000, at *2, *19 (S.D. Ohio Dec. 30, 2014) (approved $1,616,595 fee as part of a settlement that was negotiated prior to filing suit and involving only corporate governance reforms); *In re Gas Natural Inc.*, No. 1:13-cv-02805, slip op. ¶ 9 (N.D. Ohio Apr. 17, 2017), Doc. 128  (approved $3.2 million fee as part of settlement that only included corporate governance reforms); *Booth Family Trust v. Jeffries, et al*, No. 2:05-cv-00860, slip op. (S.D. Ohio Dec. 19, 2011), Doc. 263 (approving $1.5 million fee award in a settlement that only included corporate governance reforms);  *In re Johnson & Johnson Derivative Litig.*, No. 10-2033 (FLW), 2013 WL 6163858, at *1, *8 (D.N.J. Nov. 25, 2013) (approved $5,383,905.76 fee as part of a settlement involving only corporate governance reforms); *In re The Home Depot, Inc. S'holder Derivative Litig.*, Case No 1:15-CV-2999-TWT, slip op. at 5 (N.D. Ga. Oct. 2, 2017), Doc. 84 (approved $1.125 million fee); *Belova v. Sharp, et al.*, Docket No. CV-07-0299-MO, slip op. (D. Or. Nov. 6, 2009), Doc. 79 (court awarded fees totaling $2,950,000); *Molloy v. Boynton, et al.*, No. 3:17-cv-01157-J-32MCR, slip op. at 4 (M.D. Fla. Nov. 2, 2018), Doc. 62 (approving $1,995,000 in attorneys' fees); *In re Henry Schein, Inc. Derivative Litig.*, No. 19-cv-06485-RLM, slip op. at ¶ 14 (E.D.N.Y. Dec. 16, 2020), Doc. 36 (approving $1.85 million in fees); *van der Gracht de Rommerswael v. Auerbach*, No. SACV 18-00236 AG (JCGx), 2019 WL 7753447, at *2, *4 (C.D. Cal. Jan. 7, 2019) (approving $1.175 million in fees). The unpublished decisions/orders are attached at Exs. 2(a) – (f) to this declaration.

### d. The Complexity of the Litigation

106. As mentioned throughout this Declaration and the papers filed in support of the Motion, shareholder derivative litigation is notoriously difficult and comprised of complex questions of law and fact. This Action is no different. Shareholders' Counsel's efforts throughout this Action involved the review and evaluation of complex legal claims and interwoven factual patterns. Yet, even in the face of complexity, Shareholders' Counsel was able to achieve a Settlement that provides substantial benefits to Wendy's and Current Wendy's Stockholders.

### e. The Professional Skill and Standing of All Counsel

107. As exemplified in their respective resumes (attached hereto as Exhibits A to Exhibits 1, 3 and 4), Shareholders' Counsel was comprised of highly skilled and specialized attorneys, all of whom possess and possessed the necessary expertise to achieve valuable derivative settlements, such as the one in this Action.

108. Additionally, Defendants were represented by a well-regarded defense firm that vigorously defended its clients.

109. Accordingly, under the circumstances, and in addition to the reasons set forth in Plaintiff's Motion, I respectfully submit that the Fee Award in the amount of $950,000 is fair and reasonable and that it should be finally approved by the Court.

## VI. THE INCENTIVE AWARD SHOULD BE APPROVED

110. Finally, I respectfully submit that the Incentive Award in the amount of $2,500 for each of the Shareholders (to be paid from the Fee Award) should be approved in light of the significant role Shareholders played in creating the significant benefits of the Settlement for the Company and all Current Wendy's Stockholders. *See* Stip. ¶ 5.6; *see In re Gas Natural Inc.*, No.

1:13-cv-02805, slip op. at 4 (N.D. Ohio Apr. 17, 2017) (approved $5,000 in service awards to two named plaintiffs), Ex. 2(a).

111.    As set forth in the supporting motion papers, Shareholders' Counsel believe that, as a matter of both equity and precedent, the Incentive Award should be approved.  Absent the active participation of the Shareholders, the Company and Current Wendy's Stockholders would not have the opportunity to derive the substantial benefits provided for in the Settlement.

112.    I respectfully submit that as a matter of policy, engaged and concerned shareholders such as Graham and Coahn in this Action should be encouraged to step forward to prosecute viable shareholder derivative claims in order to provide a check to the conduct of corporate boards. Approval of the Incentive Award would serve this salutary purpose.

## VII.    CONCLUSION

113.    For the reasons set for above and in the accompanying Motion, I respectfully submit that the Settlement and the Fee Award are fair, reasonable, adequate, and should be finally approved.

114.    Attached hereto are true and correct copies of the following exhibits:

Exhibit 1:    Declaration of Nina M. Varindani on Behalf of Faruqi & Faruqi, LLP in Support of Award of Plaintiff's Counsel's Application for Award of Attorneys' Fees and Reimbursement of Expenses and Exhibit A, Faruqi & Faruqi, LLP Firm Resume;

Exhibit 2:    Opinions/Orders

Exhibit 2(a):    *In re Gas Natural Inc.*, No. 1:13-cv-02805, slip op. (N.D. Ohio Apr. 17, 2017), Doc. 128;

Exhibit 2(b):    *Booth Family Trust v. Jeffries, et al*, No. 2:05-cv-00860, slip op. (S.D. Ohio Dec. 19, 2011), Doc. 263;

Exhibit 2(c):    *In re The Home Depot, Inc. S'holder Derivative Litig.*, Case No 1:15-CV-2999-TWT, slip op. (N.D. Ga. Oct. 2, 2017);

Exhibit 2(d):   *Belova v. Sharp, et al.*, Docket No. CV-07-0299-MO, slip op. (D. Or. Nov. 6, 2009), Doc. 79 ;

Exhibit 2(e):   *Molloy v. Boynton, et al.*, No. 3:17-cv-01157-J-32MCR, slip op. (M.D. Fla. Nov. 2, 2018), Doc. 62 ; and

Exhibit 2(f):   *In re Henry Schein, Inc. Derivative Litig.*, No. 19-cv-06485-RLM, slip op. (E.D.N.Y. Dec. 16, 2020), Doc. 36

Exhibit 3:   Declaration of Richard S. Wayne on behalf of Strauss Troy Co., LPA in Support of Plaintiff's Counsel's Application for Award of Attorneys' Fees and Reimbursement of Expenses and Exhibit A, Strauss Troy Co., LPA Firm Resume

Exhibit 4:   Declaration of James M. Ficaro on behalf of The Weiser Law Firm, P.C. in Support of Plaintiff's Counsel's Application for Award of Attorneys' Fees and Reimbursement of Expenses and Exhibit A, The Weiser Law Firm Resume

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed this 5th day of August, 2021, at Bluebell, Pennsylvania.

Stuart J. Guber
(amended *pro hac vice*
forthcoming)