# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: August 11, 2022

Mr. Eric K. Combs
Dinsmore & Shohl
255 E. Fifth Street
Suite 1900
Cincinnati, OH 45202

Mr. William K. Flynn
Strauss Troy
150 E. Fourth Street
Fourth Floor
Cincinnati, OH 45202

Mr. Evan Glustrom
Mr. John Ludlow Latham
Ms. Courtney Quiros
Ms. Cara Peterman
Alston & Bird
1201 W. Peachtree Street, N.E.
Suite 4900
Atlanta, GA 30309

Mr. Stuart Jay Guber
Evangelista Worley
500 Sugar Mill Road
Suite 245 Building A
Atlanta, GA 30350

Ms. Melinda Nicholson
Kahn Swick & Foti
1100 Poydras Street
Suite 3200
New Orleans, LA 70163

Mr. Roger Sachar
Law Office of Daniel L. Abrams, PLLC
1250 Broadway
27th Floor
New York, NY 11211

Ms. Nina M. Varindani
Faruqi & Faruqi
685 Third Avenue
26th Floor
New York, NY 10017

Mr. Richard Stuart Wayne
Strauss Troy
150 E. Fourth Street
Fourth Floor
Cincinnati, OH 45202

       Re: Case No. 21-3975, *James Graham, et al v. Nelson Peltz, et al*
          Originating Case No. : 1:16-cv-01153

Dear Counsel,

 The court today announced its decision in the above-styled case.

 Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

            Yours very truly,

            Deborah S. Hunt, Clerk


            Cathryn Lovely
            Deputy Clerk

cc: Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0184p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

IN RE: THE WENDY'S COMPANY SHAREHOLDER DERIVATIVE ACTION.
_____

JAMES GRAHAM, derivatively on behalf of The Wendy's Company,
         *Plaintiff-Appellee*,

THOMAS CARACCI, derivatively on behalf of The Wendy's Company,
         *Plaintiff-Appellant*,

  *v*.

NELSON PELTZ; PETER W. MAY; EMIL J. BROLICK; CLIVE CHAJET; EDWARD P. GARDEN; JANET HILL; JOSEPH A. LEVATO; J. RANDOLPH LEWIS; PETER H. ROTHSCHILD; DAVID E. SCHWAB, II; ROLAND C. SMITH; RAYMOND S. TROUBH; JACK G. WASSERMAN; MICHELLE J. MATHEWS-SPRADLIN; DENNIS M. KASS; MATTHEW PELTZ; TODD A. PENEGOR; ROBERT D. WRIGHT; THE WENDY'S COMPANY,
         *Defendants-Appellees*.

No. 21-3975

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:16-cv-01153—Timothy S. Black, District Judge.

Argued: July 20, 2022

Decided and Filed: August 11, 2022

Before: WHITE, BUSH, and READLER, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Roger A. Sachar, NEWMAN FERRARA LLP, New York, New York, for Appellant. Stuart J. Guber, EVANGELISTA WORLEY LLC, Atlanta, Georgia, for Appellee James Graham. Cara Peterman, ALSTON & BIRD, Atlanta, Georgia, for Appellees Nelson Peltz, et al. **ON BRIEF:** Roger A. Sachar, NEWMAN FERRARA LLP, New York, New York, Melinda A. Nicholson, KAHN SWICK & FOTI, LLC, New Orleans, Louisiana, for Appellant.

Stuart J. Guber, EVANGELISTA WORLEY LLC, Atlanta, Georgia, Nina M. Varindani, FARUQI & FARUQI, LLP, New York, New York, Richard S. Wayne, William K. Flynn, STRAUSS TROY, Cincinnati, Ohio, for Appellee James Graham. Cara Peterman, John L. Latham, Courtney Quirós, Evan N. Glustrom, ALSTON & BIRD, Atlanta, Georgia, Eric K. Combs, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Appellees Nelson Peltz, et al.

_____

**OPINION**

_____

CHAD A. READLER, Circuit Judge. Hackers compromised customer-payment information at several Wendy's franchisee restaurants. That difficulty for Wendy's and its franchisees soon became a difficulty for the company's directors and officers, when a number of shareholders took legal action against Wendy's directors and officers on the corporation's behalf to remedy any wrongdoing that might have allowed the breach to occur. Three shareholder derivative legal efforts ensued—two actions and one pre-suit demand—leading to a series of mediation sessions between the interested parties. Two of the efforts resulted in a settlement, which the district court approved after appointing one of the settling shareholder's attorneys as the lead counsel. Those decisions drew unsuccessful objections from Thomas Caracci, a shareholder who had been pursuing one of the derivative actions, but had not participated in the latest settlement discussions. Caracci now appeals a host of decisions made by the district court, which together had the effect of dramatically reducing Caracci's entitlement to an attorney's fees award. Because the court acted within the bounds of its wide discretion to manage shareholder litigation, we affirm.

**I.**

Founded in Columbus, Ohio in 1969, Wendy's is the second-largest hamburger fast-food chain in the United States. *See* The Wendy's Co., Quarterly Report (Form 10-Q) (May 11, 2022). Since its founding, Wendy's has been known for its "old fashioned" square hamburger patties. Today, many of its restaurants are operated by company franchisees.

What was likely inconceivable when Wendy's first began flipping burgers later became a modern reality for its business: point-of-sale systems were digitized, meaning customers may

purchase their single (or double or even triple) and fries through electronic means. While those developments brought numerous conveniences to restauranteurs and their customers alike, they also brought new means of fraud and theft achieved through cyberattacks. For Wendy's, that threat was realized when the company discovered that their point-of-sale systems at several franchise locations contained "malware"—that is, malicious software that allows cybercriminals to extract data for financial gain. Following an investigation, Wendy's removed the malware and publicly disclosed the incident.

The data breach alarmed several of Wendy's shareholders, including Thomas Caracci, James Graham, and Michael Coahn. Caracci, relying on Section 220 of the Delaware General Corporation Law, sought to inspect Wendy's corporate books and records to examine whether the cyberbreach was attributable to corporate mismanagement or wrongdoing by Wendy's officers and directors. Wendy's produced documents to Caracci, subject to a confidentiality agreement. Later that same year, Graham filed a derivative lawsuit against several of Wendy's officers and directors. Graham alleged that those corporate officials failed to properly oversee the company's cybersecurity risks. Defendants moved to dismiss Graham's complaint in part on the basis that it failed to adequately plead demand futility—the requirement that a plaintiff shareholder in a derivative lawsuit allege that it would have been futile for the shareholder to first afford the company's board of directors the opportunity to redress the alleged wrong to the corporation. *See* Fed. R. Civ. P. 23.1(b)(3) (stating the pleading requirement); *Rales v. Blasband*, 634 A.2d 927, 932–35 (Del. 1993) (discussing substantive demand futility standards under Delaware law). Not long thereafter, Coahn demanded that the company's board investigate and litigate potential breaches of fiduciary duty related to the data breach. The next day, Caracci, relying on the Section 220 documents received from Wendy's, filed his own derivative suit.

Graham and Caracci agreed that their two cases should be consolidated, a request the district court obliged. Both Graham and Caracci also filed separate motions asking that his respective counsel be appointed lead counsel. And from there, the pair's relationship became frosty at best, with the two rarely seeing eye-to-eye on the litigation's development.

The story unfolds this way.  Defendants sought to resolve the pending litigation and the Coahn demand through settlement talks.  At the outset of the settlement discussions, defendants provided Graham, Caracci, and Coahn with documents—including the Section 220 documents—subject to confidentiality restrictions, including the mediation privilege.  But negotiations soon stalled, largely over the issue of attorney's fees.  Caracci's counsel objected to a proposal from the other shareholders' counsel to "work together as equals."  Caracci's counsel seemingly had other ideas, instead requesting over 90% of the fees award, up to $3 million in all.

Several months passed.  Working with a cybersecurity expert, counsel for Graham and Coahn opted to submit their own settlement proposal to defendants.  The proposal prompted defendants to renew mediation before a new mediator—a former managing partner of the law firm King & Spalding.  Caracci declined an invitation to participate in the mediation.  After a day-long negotiation session, the participating parties reached material agreements as to corporate governance measures that would be at the heart of an eventual settlement.  In particular, Wendy's agreed to establish a technology committee to oversee cybersecurity-related matters, with managers formally reporting to that committee.  With the aid of the mediator, Graham, Coahn, and defendants later reached an agreement as to attorney's fees.  $950,000 was slated for Graham's and Coahn's counsel, subject to court approval, and the district court could order up to $200,000 to be paid out of this amount to third parties and their counsel.

Tasked with overseeing the potential settlement, the district court issued several rulings, all over Caracci's objections.  To start, the district court appointed Graham's counsel as the lead counsel.  In so doing, the court emphasized counsel's efforts in working with the other interested shareholders, their prior experience with cybersecurity corporate litigation, and the qualifications of the cybersecurity expert retained by Graham's attorneys.  Once in the lead role, Graham filed a consolidated complaint utilizing the same Section 220 documents referenced in Caracci's complaint.  Graham then sought preliminary approval of the settlement, a request the district court granted.  In deciding as much, the court rejected Caracci's contention that the other parties had colluded to effectuate the settlement.  Influential to the district court was a sworn declaration submitted by the mediator indicating that "the parties at all times engaged at arms-length" and

that nothing led the mediator "to believe that the parties, their counsel, or [Wendy's] were engaging in collusive or inappropriate conduct."

Several months later, the court allowed Caracci to conduct limited discovery to investigate the fairness and adequacy of the proposed settlement. Limits on the scope of that discovery, however, left the process less fulsome than Caracci had hoped. Nor was Caracci able to obtain the district court's permission to disclose "information revealed during" settlement discussions to use in an objection to the final settlement, especially given the court's denial of relief from the mediation privilege.

No other shareholder objected to the settlement. After conducting a fairness hearing and considering Caracci's objections, the district court granted final approval to the settlement. Caracci's timely appeal followed.

## II.

Caracci takes issue with numerous aspects of the district court's handling of these consolidated cases: its appointment of a lead counsel, its approval of the settlement, and its interlocutory orders on discovery and the mediation privilege. While these are distinct legal issues, each implicates the district court's discretionary role in supervising complex litigation. Accordingly, as will be a theme throughout, the district court's answers to these questions are each reviewed for an abuse of discretion. *See In re Bendectin Litig.*, 857 F.2d 290, 297 (6th Cir. 1988) (authority to create lead-counsel committee); *In re Flint Water Cases*, 960 F.3d 820, 826 (6th Cir. 2020) (managing discovery); *In re Univ. of Mich.*, 936 F.3d 460, 465 (6th Cir. 2019) (disclosure of settlement discussions); *McDannold v. Star Bank, N.A.*, 261 F.3d 478, 488 (6th Cir. 2001) (evaluating settlement of derivative actions); *see also Salve Regina Coll. v. Russell*, 499 U.S. 225, 233 (1991) ("[I]t is 'especially common' for issues involving supervision of litigation to be reviewed for abuse of discretion." (citation omitted)).

This deferential standard frames our review. In this posture, we are not attempting to second guess the district court's approach to managing the litigation. *See Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001). As a result, we will upset the district court's decisions only if we have a "definite and firm conviction" that the district court "committed a

clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 602 (6th Cir. 2018) (citation omitted).

**A.**

Caracci's primary challenge is that the district court erred in appointing Graham's counsel as lead counsel for the consolidated cases. Generally speaking, lead counsel is "[c]harged with formulating (in consultation with other counsel) and presenting positions on substantive and procedural issues during the litigation" on behalf of other counsel and their clients. Manual for Complex Litigation (Fourth) § 10.221 (2004); *see also In re Bendectin Litig.*, 857 F.2d at 297. At bottom, the selection of lead counsel is one of the means by which a district court, through its inherent power, manages proceedings. *See In re Bendectin Litig.*, 857 F.2d at 297; *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 845 (6th Cir. 2020) (noting the power of a federal court to "designate a lead counsel" to manage complex proceedings (quoting *In re Korean Air Lines Co.*, 642 F.3d 685, 700 (9th Cir. 2011))). As a result, whether the district court properly designated a lead counsel presents a question of procedure governed by federal (not state) law, leaving little reason to certify the issue to the Delaware Supreme Court, as Caracci asks. *See Legg v. Chopra*, 286 F.3d 286, 289 (6th Cir. 2002) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

In exercising its inherent authority to appoint lead counsel, the district court should select the counsel who will best honor the interests of the plaintiffs litigating on behalf of the corporation. *See* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2385 (3d ed. 2022); *see also Horn v. Raines*, 227 F.R.D. 1, 3 (D.D.C. 2005). The unique nature of that decision requires more than a one-size-fits-all rule. We expect a district court to take account of various factors in appointing lead counsel, including counsel's qualifications and experience, counsel's ability to work cooperatively with opposing counsel and the court, the nature of the causes of action alleged, the quality of the pleadings, and any prior agreements amongst the parties. *See* Manual for Complex Litigation (Fourth) § 10.224 (2004); *see also* 15 Jack K. Levin, *Cyclopedia of Fed. Procedure* § 78:60 (3d ed. 2022); 3 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 10:12 (6th ed. 2022).

Taking these considerations into account, we do not see an abuse of discretion by the district court in appointing Graham's counsel as lead. Graham's counsel, the district court observed, had litigated one of the first cyberbreach related derivative lawsuits in federal court. That experience no doubt informed counsel's decision to retain a well-qualified expert to propose corporate governance reforms that could help resolve the dispute. And, as the district court fairly emphasized, Graham's counsel was able and willing to work with all parties in aid of a settlement, an understandably "welcome" goal for complex derivative litigation. *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) (citation omitted).

Compare this to the option presented by Caracci's counsel. Caracci's counsel refused to work on an equal footing with other interested parties, and sought up to 90% of the attorney's fees generated by the suit. Nor did the district court find Caracci's pleadings to be materially stronger than those filed by Graham's counsel, noting that a prior order authorized whoever was appointed lead counsel to file a consolidated complaint. In highlighting these conclusions by the district court, we do not demean any party's counsel; a different trial court, in fact, may have found Caracci's counsel's legal attributes more compelling. But with the district court having considered and made reasoned findings as to the relevant factors that inform the appointment of lead counsel, we cannot definitively say that the court committed a "clear error of judgment" in selecting Graham's counsel. *Mosby-Meachem*, 883 F.3d at 602 (citation omitted).

Caracci resists this conclusion on numerous grounds. Most of them feature the fact that his counsel obtained Section 220 documents from Wendy's before litigation ensued, while Graham did not. Those documents typically include the books and records of a corporation, which may encompass books of account, minutes of the meetings of directors, and corporate documents. 2 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 13:4 (3d ed. 2021); *see also KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 742, 749–58 (Del. 2019) (discussing Section 220's scope). With the benefit of these documents, Caracci contends that his pleadings outmatched Graham's, a consideration that Caracci believes should have been dispositive in the appointment analysis. In particular, Caracci emphasized, his complaint alleged facts tied to discussions at corporate meetings, while Graham's did not. The district court, however, took a wider view of things. In assessing whether that decision

amounted to an abuse of discretion, we do not "reweigh the equities or reassess the facts." *Gavitt v. Born*, 835 F.3d 623, 639 (6th Cir. 2016). Rather, we aim to ensure "that the [district] court's weighing of interests was sound and supported by the record." *Id.* And, as already explained when looking at the factors as a whole, we do not see how Caracci's side of the scale seriously outweighed Graham's.

Nor would it make sense to have the appointment decision turn solely on which plaintiff first obtained Section 220 documents. Caracci cites no appellate decision blessing that approach. And it does not seem to be the case that complaints from parties who fail to "bring[] a § 220 books and records action" are necessarily inadequate. *Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612, 618 (Del. 2013); *see also In re Wal-Mart Stores, Inc. Del. Derivative Litig.*, C.A. No. 7455-CB, 2016 WL 2908344, at *20 (Del. Ch. May 13, 2016) ("[I]t does not follow that plaintiffs are necessarily inadequate representatives because their counsel chose not to" make a 220 demand "particularly when they are litigating in a different jurisdiction before a different judiciary."); *Laborers' Dist. Council Constr. Indus. Pension Fund v. Bensoussan*, C.A. No. 11293-CB, 2016 WL 3407708, at *12 (Del. Ch. June 14, 2016) (similar), *aff'd*, 155 A.3d 1283 (Del. 2017); *see also Beam v. Stewart*, 845 A.2d 1040, 1056 n.51 (Del. 2004) (noting that Section 220 is "a possible method of securing facts"); *Rales*, 634 A.2d at 935 n.10 (noting that there are "many avenues available to obtain information," including "a variety of public sources from which the details of a corporate act may be discovered"). Equally true, the Section 220 tool seemingly remained available to Graham even after he filed his derivative action. *See King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1141, 1146 (Del. 2011) (holding that the prior filing of a derivative action does not preclude a shareholder from pursuing a later Section 220 books and records request); *see also Kortum v. Webasto Sunroofs, Inc.*, 769 A.2d 113, 125 (Del. Ch. 2000) (holding that statutory inspection rights cannot be waived unless "clearly and affirmatively expressed" in a relevant document). *But cf. CHC Invs., LLC v. FirstSun Cap. Bancorp*, No. CV 2018-0610-KSJM, 2019 WL 328414, at *4 (Del. Ch. Jan. 24, 2019) (holding that a court may "deem[] the plenary complaint insufficient and permit[] a stockholder to replead or amend" to allow a Section 220 request to commence in aid of the previously filed suit); R. 72, PageID#1648 (suggesting that at worst Graham's complaint would have been dismissed without prejudice). Caracci believes his rule, nonetheless, is necessary to stave off races to the

courthouse. But his approach would simply move that sprint to a different track—races for Section 220 documents. Nor, it bears adding, does today's case appear to march in Caracci's purported parade of horribles, as any race here was run by tortoises. Graham's 75-page complaint, after all, was filed almost a year after Wendy's first disclosed the data breach.

At all events, Caracci overstates the value added by the Section 220 documents. All parties agree that because neither Caracci nor Graham made a pre-suit demand, their complaints each needed to plausibly allege demand futility. *See* Fed. R. Civ. P. 23.1(b)(3). They both did so based on the theory that the company's officers and directors behaved so egregiously in failing to oversee Wendy's operations that they faced a substantial likelihood of personal liability, making them incapable of evaluating a demand. *See United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1058 (Del. 2021) (discussing the relevant standard for evaluating allegations of demand futility). To adequately allege demand futility on this basis, a complaint must plead with particularity that defendants "completely failed to implement any reporting or information system or controls, or, having implemented such a system or controls, consciously failed to monitor or oversee those operations." *See Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019) (cleaned up); *see also City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017); *cf. Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96, 108–09 (1991) (holding that while Federal Rule of Civil Procedure 23.1 establishes procedural requirements concerning the "adequacy of the shareholder representative's pleadings," state law governs the substance of the demand requirement).

True, as Caracci emphasizes, his complaint, unlike Graham's, used Section 220 documents to plead demand futility. But in this case, those documents do not strike us as the tipping point where a complaint crosses over the Rule 12(b)(6) threshold. At best, the documents referenced in Caracci's complaint reveal that Wendy's officers and directors regularly considered the company's cybersecurity risks, but, like leaders of many other corporations, could have done more to avoid falling victim to cybercrime. Yet Graham alleged much the same thing, a fact that Caracci largely acknowledged when he characterized the respective complaints as asserting "similar facts and allegations." R. 17-1, PageID#218.

Graham's lawsuit alleged that Wendy's officers and directors knew of and failed to oversee the company's cybersecurity risks by relying on news stories and public filings and by detailing prior litigation between Wendy's and one of its biggest franchisees. Caracci's complaint, on the other hand, referred to materials gleaned from the Section 220 production, such as Wendy's Audit Committee and Board meeting notes. But all in all, the complaints' respective factual allegations had the same flavor.

In the end, both complaints faced the same challenge: their shared underlying legal theory, a theory that, in at least one court's eyes, is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 372 (Del. 2006) (citation omitted). Reflecting as much, many recent derivative lawsuits concerning corporate cybersecurity practices based on this theory have failed at the dismissal stage. *See, e.g.*, *Firemen's Ret. Sys. of St. Louis ex rel. Marriott Int'l, Inc. v. Sorenson*, C.A. No. 2019-0965-LWW, 2021 WL 4593777, at *19 (Del. Ch. Oct. 5, 2021); *In re The Home Depot, Inc. S'holder Derivative Litig.*, 223 F. Supp. 3d 1317, 1332 (N.D. Ga. 2016); *cf. Palkon v. Holmes*, No. 2:14-CV-01234 (SRC), 2014 WL 5341880, at *6 (D.N.J. Oct. 20, 2014). *See generally* Neil A.F. Popović, *Cloud Computing Legal Deskbook* § 20:14 (2021) (observing that "early efforts to pursue derivative claims" "following data breach events" "have foundered"); 1 Gerald D. Peake, *Data Sec. and Priv. L.* § 8:55 (2021) ("[D]ata breach derivative litigation matters are challenging for shareholders to pursue."). The two cases, in other words, stood roughly at the same starting point to undertake the steep climb ahead. And while noting in passing that the Section 220 documents were also needed to plead a claim under Section 14(a) of the Securities Exchange Act, Caracci has likewise failed to articulate why Graham could not have similarly alleged, in the absence of the Section 220 documents, a violation of the Securities Exchange Act. All things considered, we see no obvious error in the district court's refusal to treat the supposed superiority of Caracci's complaint as dispositive.

**B.**

What remains of Caracci's appeal turns largely on the question of whether the district court erred in approving the settlement. To settle a derivative action, the parties must obtain the district court's approval. Fed. R. Civ. P. 23.1(c). And to garner the court's approval, the

proposed agreement must be "reasonable, fair and adequate." *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984); 7C Wright & Miller, *supra* § 1839 ("The generally accepted standard is that the agreement must be fair and adequate in light of the interests of all the parties . . . ."). The "[r]elevant factors" that inform this determination include, among other things, whether a disinterested corporate board has approved the proposal, the plaintiff's probability of success, the risks associated with the expense and complexity of litigation, and the nature of the objections made to the settlement. *Granada Invs., Inc.*, 962 F.2d at 1205; 7C Wright & Miller, *supra* § 1839; *cf. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (similar considerations for class action settlements). We afford the district court "wide discretion" in making that assessment. *Granada Invs., Inc.*, 962 F.2d at 1205 ("Absent evidence of fraud or collusion, such settlements are not to be trifled with."). By and large, we ask only whether the settlement is "so unfair on its face as to preclude judicial approval." 7C Wright & Miller, *supra* § 1839 (quoting *Glicken v. Bradford*, 35 F.R.D. 144, 151 (S.D.N.Y. 1964)) (explaining that approval should not be a product of a "trial of the case's merits" or hinge on the district court's own business judgment).

The district court did not abuse its discretion in approving the settlement. In the court's view, the settlement helped rectify the conduct that gave "rise to this derivative litigation"—an alleged lack of corporate oversight—by "implement[ing] a series of cybersecurity reforms," including the establishment of a technology committee that created formal mechanisms for monitoring Wendy's cybersecurity risks. That consideration was bolstered by the recognition that any derivative matter arising out of a data breach would ultimately face an "uphill battle" on the merits. In addition, the court did not find anything untoward about how the settlement was reached, a process guided by an independent mediator who oversaw "hard-fought negotiations" between the settling parties that spanned several weeks.

Caracci believes that Graham's counsel and defendants colluded to exclude him from their settlement discussions. Caracci's suspicions seem to rest on the assumption that, without the Section 220 documents, Graham's counsel was an easy mark whom defendants could extort in negotiations. But why, if, as Caracci's challenge implies, the parties represented by three

No. 21-3975 *Graham v. Peltz, et al.* Page 12

different sets of counsel were all in cahoots, did it take months of mediation with an independent mediator to resolve the case? Carracci does not say. In any event, the record is devoid of evidence supporting the assertion that the attorneys representing Graham, Coahn, and corporate defendants connived to exclude Caracci from the settlement process. Much to the contrary, in fact. The settling shareholders repeatedly asked Caracci to work with them as equal partners. Yet those inquiries were rebuffed, as Caracci instead sought to control the litigation and pursue up to $3 million in attorney's fees—far beyond any comparable awards in similar litigation. Were there any doubt about the propriety of the settlement process, the district court's views were well-supported by the declaration of the mediator (a former managing partner of King & Spalding), who averred under penalty of perjury that the mediation occurred at arm's length.

Caracci also contends that the settlement provided only "illusory" governance improvements that would not "improve upon Wendy's existing structures" to "help prevent a data breach." Appellant's Br. at 45, 48. But Caracci's complaints amount to little more than speculation. And we are not inclined to second guess the district court's considered views on the settlement's value. *See Gavitt*, 835 F.3d at 639 (holding that an appellate court cannot "reweigh the equities or reassess the facts" when reviewing for an abuse of discretion). Aided by the settling parties' expert-guided submissions, the district court thoughtfully explained how the settlement's creation of formal corporate channels to oversee the company's cybersecurity risks "already provided, and [would] continue to provide, a substantial benefit to the Company" by improving Wendy's "overall cybersecurity." R. 101, PageID #2281-82.

Perhaps, as Caracci suggests, other reforms might have been superior. But the district court was tasked with deciding not whether the proposed settlement was the best one imaginable, but only whether it was fair and adequate under the relevant circumstances. *Cf. Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) ("[T]he question whether a settlement is fundamentally fair within the meaning of Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court."). On that score, the district court fairly considered the fact that even if the immediate benefits of the settlement were minimal, they had to be judged against the backdrop of the tough road to victory on the merits. Recognizing the settlement's benefits relative to the risks of continuing the litigation was not outside of the

No. 21-3975 *Graham v. Peltz, et al.* Page 13

wide bounds of discretion the district court enjoyed. *See Granada Invs., Inc.*, 962 F.2d at 1206 (agreeing that the district court had not abused its discretion in approving a settlement creating a "new special committee with oversight powers," when it was "not far-fetched to consider [such] governance changes" as genuinely beneficial).

## C.

Caracci has one last arrow in his quiver. Even if his objections to the settlement were insufficient, he says, he still should have been able to use information from either the initial mediation sessions or additional discovery into the subsequent settlement negotiations to make a more robust objection. Here too we do not see an abuse of discretion by the district court.

Start with Caracci's request for relief from the mediation privilege. Caracci contends that the district court should have allowed him to discuss "various improprieties that . . . took place as part of the mediation process" in which he participated. Caracci's request runs into two immediate hurdles. One is the fact that he executed two separate nondisclosure agreements that required him to maintain the confidentiality of the parties' settlement discussions and any documents provided in those discussions. The other is that both Delaware and federal law recognize a privilege protecting communications made during mediation proceedings, to encourage candor between the negotiating parties. *See Princeton Ins. Co. v. Vergano*, 883 A.2d 44, 62–63 (Del. Ch. 2005); *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980 (6th Cir. 2003).

In unique circumstances, there may be limits to the scope of a mediation privilege or the enforceability of a confidentiality agreement. *See, e.g.*, *Goodyear Tire & Rubber Co.*, 332 F.3d at 981–82. And perhaps disclosing that material would have aided the district court in assessing the settlement's propriety. But Caracci cites no authority to suggest that any privilege or contractual obligations should be excused as a general matter to facilitate a district court's obligations under Rule 23.1(c). Which is not surprising. After all, parties to a derivative action would be unlikely to be candid with one another if they knew those discussions were fair game to impugn their ultimate settlement following any bare allegation of misconduct.

No. 21-3975                    *Graham v. Peltz, et al.*                    Page 14

Nor do we agree with Caracci that the settling parties waived their confidentiality obligations by referencing the mediation session when seeking preliminary approval of the settlement. The record belies such a suggestion. Consistent with notions of confidentiality, the settling parties disclosed only high-level information about the settlement discussions (such as their existence) to the district court. Those disclosures complied with the applicable privileges and confidentiality agreements. *See id.* And that information, in any event, is a far cry from what Caracci seeks: full disclosure of the substance of those settlement discussions. Under these circumstances, we cannot say that the district court abused its discretion by not allowing Caracci to divulge the substance of what he learned during the initial mediation session.

Caracci also believes he was entitled to further discovery to "inspect whether there were improprieties that occurred" during the second round of settlement negotiations. Here, we are left wondering: where's Caracci's beef with the district court? The district court, remember, allowed Caracci to conduct discovery on a range of issues regarding the settlement. But Caracci came home empty handed. Any right to additional discovery was conditioned on his showing a "colorable claim that the settlement should not be approved." *Gen. Motors Corp.*, 497 F.3d at 637. Yet all Caracci offers are "unsupported suppositions" about unspecified improprieties during settlement discussions he freely chose not to attend. *Geier v. Alexander*, 801 F.2d 799, 809 (6th Cir. 1986) (citation omitted). Having allowed Caracci to engage in limited discovery, the district court did not abuse its discretion by declining to sanction a speculative inquiry into Caracci's collusion theory. *See Gen. Motors Corp.*, 497 F.3d at 637.

### III.

We affirm the judgment of the district court.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-3975

IN RE: THE WENDY'S COMPANY SHAREHOLDER DERIVATIVE ACTION.

_____

JAMES GRAHAM, derivatively on behalf of The Wendy's Company,

    Plaintiff - Appellee,

THOMAS CARACCI, derivatively on behalf of The Wendy's Company,

    Plaintiff - Appellant,

    v.

NELSON PELTZ; PETER W. MAY; EMIL J. BROLICK; CLIVE CHAJET; EDWARD P. GARDEN; JANET HILL; JOSEPH A. LEVATO; J. RANDOLPH LEWIS; PETER H. ROTHSCHILD; DAVID E. SCHWAB, II; ROLAND C. SMITH; RAYMOND S. TROUBH; JACK G. WASSERMAN; MICHELLE J. MATHEWS-SPRADLIN; DENNIS M. KASS; MATTHEW PELTZ; TODD A. PENEGOR; ROBERT D. WRIGHT; THE WENDY'S COMPANY,

    Defendants - Appellees.

**FILED**
Aug 11, 2022
DEBORAH S. HUNT, Clerk

Before: WHITE, BUSH, and READLER, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk